418 S.E.2d 580

**STATE of West Virginia ex rel. LAUREL MOUNTAIN/FELLOWSVILLE AREA CLEAN WATERSHED ASSOCIATION, INC., David M. Haggerty, David C. Houser, George M. Ridenour, Carol T. Larew, Ray E. Simons, Margie Ridenour, Acie Hershman, Lowell Larew, David Combian, Edward E. Knotts, Wanda Joyce King, John F. Murray, Clyde W. Ridenour, Lydia C. Hershman, Tina Huffman, Jerry Lee Murray, Richard Glenn Matlick, Garner Larew, William E. Poling, Daniel L. Murray, Billy L. Hovatter, Virginia Hurrman, Robert Shiff, Larry F. Huffman, Violet M. Pyles, Richard A. Phillips, Jimmy Davis, Leland A. Bolyard, Lorn A. Wolfe, L. Darwin Wolfe, Vana Hershman, Terry Shipp, Debbie Shipp, Helen Huffman, Kip Colebank, Orpha E. Bolyard, Edward E. Murray, Jack C.**

**Hershman, Patsie Bolyard, Donald P. Knotts, William R. Murray, Walter E. Murray, Ricky E. Murray, Junior P. Knotts, Ronald Phillips, James E. Channel and Stanley W. Jennings, Petitioners,**

**v.**

**David C. CALLAGHAN, Director, West Virginia Division of Environmental Protection, and F & M Coal Company, a Partnership, Respondents.**

**No. 21062.**

Supreme Court of Appeals of West Virginia.

Submitted April 28, 1992.

Decided May 15, 1992.

Tom Rodd, Morgantown, and Robert F. Cohen, Jr., Cohen, Abate & Cohen, Fairmont, for petitioners.

Mario J. Palumbo, Joseph A. Lazell, Office of the Atty. Gen., for respondent.

McHUGH, Chief Justice:

In this original proceeding, the petitioners, the Laurel Mountain/Fellowsville Clean Water Association and numerous citizens, seek a writ of mandamus compelling the respondent, the Director of the Division of Environmental Protection (the "Division"), to take over and operate the acid mine drainage treatment facilities of F & M Coal Company, by using the proceeds from forfeiture bonds totalling $268,000. F & M is also a respondent in this proceeding, but has made no appearance.

I

From 1984 to 1988, F & M obtained three performance bonds totalling $268,000 in order to operate under surface mine permits on Laurel Mountain in Preston County.[1] *See W.Va.Code,* 22A-3-11 [1990].

The petitioners allege that F & M's surface mining on Laurel Mountain has disturbed large amounts of rock overburden which contain acid-producing materials, and as a result of the exposure of such materials to ground and surface water drainage, these mine sites have become a potent source of acid mine drainage in the headwaters of the Left Fork of Sandy Creek.

The petitioners further allege that prior to F & M's surface mining, which began in 1984, acid mine drainage was not a significant problem in the Left Fork. The respondent, on the other hand, argues that a "probable hydrologic consequences" report, which was done in connection with F & M's first permit application in 1984, indicated that the pH factor in the water was between 3.0 and 4.4 at that time.[2] Moreover, the respondent contends that this was caused by mining performed prior to the time that permits were required. In other words, the respondent maintains that the quality of the water was deteriorated prior to F & M's mining. However, the respondent acknowledges that from 1984 to 1991, F & M's surface mining operations had an adverse impact on aquatic life in the Left Fork, and consequently, by 1991, the stream was biologically dead.

From 1986 to 1991, the Division issued a total of 56 violations to F & M relating to a wide range of surface mining requirements.

In early 1991, a "show cause" hearing was set for June, 1991, so that F & M could demonstrate why its permits should not be revoked. *See W.Va.Code,* 22A-3-17 [1991]. However, in March, 1992, F & M withdrew its request for a show cause hearing, and accordingly, the Division sent letters to the sureties requesting payment on the surety bonds.

In October, 1990, F & M had filed a petition for relief under Chapter 11 of the United States Bankruptcy Code. In December, 1990, F & M auctioned several assets, realizing proceeds in the amount of $1.5 million, which it then used to treat acid mine drainage at Laurel Mountain.[3]

In March, 1991, the unsecured creditors of F & M asked the bankruptcy court to prohibit F & M from continuing to expend funds for acid mine drainage treatment. This request, which was opposed by the Division, F & M, and others, was denied in May, 1991, and renewed by other unsecured creditors in September, 1991. In November, 1991, following a hearing, the bankruptcy court authorized F & M to spend $10,150 on a monthly basis for the continued treatment of acid mine drainage.

Following negotiations, the bankruptcy court held two telephonic hearings on March 4, 1992, and March 13, 1992. The petitioners point out that at these hearings, counsel for the Division stated that the Division would take over operations of F & M's acid mine drainage treatment facilities immediately.[4]

On March 13, 1992, the bankruptcy court entered an order freezing F & M's remaining funds, which, at this point, amounted to only $68,000; forfeiting the bonds in favor of the State; and holding that the responsi-

1. The bonds included one obtained in 1984 in the amount of $99,000; one obtained in 1986 in the amount of $72,000; and one obtained in 1988 in the amount of $97,000.

2. The "pH" level measures the acidity of water by its hydrogen-ion concentration. The values of the pH scale run from 0 to 14, with 7 representing neutrality. State regulation requires the pH level to be between 6.0 and 9.0. *See* 38 *C.S.R.* § 2-14.5 (1991); 40 *C.F.R.* § 434.32 (1991).

3. The petitioners also allege that following F & M's treatment for acid mine drainage in 1989 and 1990, minnow populations reappeared where there had been none in several years.

4. Later, however, counsel for the Division stated that perhaps he unintentionally misrepresented the Division's position on how it intended to address the acid mine drainage problem, and that the Division should initiate bond forfeiture proceedings and reclamation in accordance with the 180 days allowable by law. *See* discussion *infra.*

bility for treatment and reclamation is with the State, although the bankruptcy court expressly made no determination as to the State's duties with respect thereto.

II

The petitioners contend that under the *Code of State Regulations*, the respondent has a nondiscretionary duty to reclaim the Laurel Mountain site by using the proceeds of performance bonds.[5]

Specifically, the petitioners rely on 38 *C.S.R.* § 2–12.4(c) (1991), which provides: "(c) Where the bond is forfeited, the proceeds shall be used by the Commissioner to accomplish the completion of reclamation, including the requirements of Section 23 of the Act and Subsection 14.5 of these regulations governing water quality." [6]

The respondent, on the other hand, maintains that it has 180 days after forfeiture to accomplish the completion of reclamation. Specifically, the provision relied upon by the respondent is 38 *C.S.R.* § 2–12.4(d) (1991), which states:

> (d) Where the proceeds of bond forfeiture used by the Commissioner to complete reclamation *are less than* the actual cost of reclamation:
>
> (1) The permittee shall be liable for all reclamation costs, and the Commissioner shall collect from the permittee all costs in excess of the amount forfeited; or
>
> (2) Notwithstanding efforts by the Commissioner to collect the costs from the permittee, the Commissioner shall in a timely manner but *not later than one hundred eighty days after forfeiture of the site-specific bond utilize monies in the Special Reclamation Fund created by Subsection (g), Section 11 of the Act, to accomplish the completion of reclamation,* including the requirements of Section 23 of the Act and Subsection 14.5 of these regulations governing water quality.

(emphasis supplied)

Accordingly, as stated in 12.4(d)(2), the respondent would have 180 days to accomplish the completion of reclamation, and this reclamation may be financed by the utilization of the "Special Reclamation Fund" created by *W. Va. Code,* 22A–3–11(g) [1990].[7]

5. The performance bonds are required pursuant to *W.Va.Code,* 22A–3–11 [1990], which is part of the Surface Coal Mining and Reclamation Act. That section provides, in part:

> (a) After a surface-mining permit application has been approved pursuant to this article, but before a permit has been issued, each operator shall furnish bond, on a form to be prescribed and furnished by the commissioner, payable to the state of West Virginia and conditioned upon the operator faithfully performing all of the requirements of this article and of the permit. The amount of the bond shall be one thousand dollars for each acre or fraction thereof. The bond shall cover (1) the entire permit area, or (2) that increment of land within the permit area upon which the operator will initiate and conduct surface-mining and reclamation operations within the initial term of the permit. If the operator chooses to use incremental bonding, as succeeding increments of surface mining and reclamation operations are to be initiated and conducted within the permit area, the operator shall file with the commissioner an additional bond or bonds to cover such increments in accordance with this section: Provided, That once the operator has chosen to proceed with bonding either the entire permit area or with incremental bonding, he shall continue bonding in that manner for the term of the permit: Provided, however, That the minimum amount of bond furnished shall be ten thousand dollars.
>
> (b) The period of liability for performance bond coverage shall commence with issuance of a permit and continue for the full term of the permit plus any additional period necessary to achieve compliance with the requirements in the reclamation plan of the permit.

6. Subsection 14.5 provides the effluent limitations as those set forth in 40 *C.F.R.* § 434. *See* note 2, *supra.*

7. *W.Va.Code,* 22A–3–11(g) [1990], which creates the Special Reclamation Fund, provides, in part:

> (g) All special reclamation taxes deposited by the commissioner with the treasurer of the state of West Virginia to the credit of the special reclamation fund prior to the effective date of this article shall be transferred to the special reclamation fund created by this section and shall be expended pursuant to the provisions of this subsection: Provided, That no taxes transferred into the special reclamation fund created by this section shall be subject to refund. The moneys accrued in the fund, including interest, are reserved solely and exclusively for the purposes set forth in

The respondent points out that this subsection imposes only a discretionary duty to use the funds in the Special Reclamation Fund. Consequently, the respondent argues that because it does not have the actual proceeds from the forfeited bonds in hand, then it cannot proceed with reclamation pursuant to 12.4(c). Rather, under 12.4(d), this would constitute a situation where the proceeds of bond forfeiture are less than the actual costs of reclamation. Therefore, under *W. Va. Code,* 22A–3–11(g) [1990], the respondent's duty to use funds from the Special Reclamation Fund is not mandatory, but merely discretionary.[8]

We do not agree with the respondent's position. There is nothing in 12.4(d) to indicate that the failure to collect the proceeds of the bonds may be equated with the situation of the bond proceeds actually being less than the cost of reclamation. Therefore, 12.4(d) would not even apply to this case, and consequently, the question of whether the respondent's action under *W. Va. Code,* 22A–3–11(g) [1990] is discretionary in this case need not even be reached.

The respondent's position in this regard is tenuous because: (1) it cannot be determined, at this point, what the actual cost will be to accomplish reclamation; and (2) *uncollected* bond proceeds do not necessarily mean *insufficient* bond proceeds.

Moreover, we believe that 12.4(c) imposes a mandatory duty upon the respondent to accomplish the completion of reclamation in this case. The plain language of that regulation makes it clear that the proceeds from a forfeited bond "*shall* be used by the Commissioner to accomplish the completion of reclamation[.]" This regulation, which is promulgated pursuant to *W. Va. Code,* 22A–3–4 [1985], operates to eliminate acid mine drainage at levels that would violate effluent limitations, thus furthering the legislative finding that "it is essential to the economic and social well-being of the citizens of the state of West Virginia to strike a careful balance between the protection of the environment and the economical mining of coal needed to meet energy requirements." *W. Va. Code,* 22A–3–2 [1985].[9]

"Where the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation." Syl. pt. 2, *State v. Elder,* 152 W.Va. 571, 165 S.E.2d 108 (1968). *See also* syl., *State ex rel. Bowlick v. Board of Education,* 176

this subsection. The fund shall be administered by the commissioner, and he is authorized to expend the moneys in the fund for the reclamation and rehabilitation of lands which were subjected to permitted surface-mining operations and abandoned after the third day of August, one thousand nine hundred seventy-seven, where the amount of the bond posted and forfeited on such land is less than the actual cost of reclamation. The commissioner shall develop a long-range planning process for selection and prioritization of sites to be reclaimed so as to avoid inordinate short-term obligations of the assets in the fund of such magnitude that the solvency of the fund is jeopardized. *The Commissioner may use an amount, not to exceed twenty-five percent of the annual amount of the fees collected,* for the purpose of designing, constructing and maintaining water treatment systems when they are required for a complete reclamation of the affected lands described in this subsection.

(emphasis supplied)

8. Moreover, the respondent asserts that utilization of funds from the Special Reclamation Fund would not be adequate to accomplish reclamation because it is likely that the actual cost of reclamation at the Laurel Mountain site would exceed the twenty-five percent limitation imposed by that subsection. However, we need not address this matter because, as discussed *infra,* this subsection is not applicable to this case.

9. The respondent also contends that 12.4 does not impose a mandatory duty upon the Division because that regulation is *silent* as to what *method* the Division should employ at bond forfeiture sites to accomplish reclamation. This contention has no merit. As we have held herein, 12.4 imposes a mandatory duty upon the Division to accomplish the completion of reclamation. This duty includes utilizing proceeds from the forfeited bonds, and the fact that the *method* is not set forth by that regulation does nothing to abrogate the respondent's duty to accomplish the completion of reclamation.

W.Va. 524, 345 S.E.2d 824 (1986); syl. pt. 1, *Tanner v. Workers' Compensation Commissioner,* 176 W.Va. 427, 345 S.E.2d 29 (1986). Similarly, when the language of a regulation promulgated pursuant to the West Virginia Surface Mining and Reclamation Act, *W.Va.Code,* 22A-3-1 *et seq.,* is clear and unambiguous, the plain meaning of the regulation is to be accepted and followed without resorting to the rules of interpretation or construction.

In that vein, our reading of 12.4(c) makes it clear that the respondent has a mandatory duty to utilize the proceeds from the forfeited bonds to accomplish the completion of reclamation at the Laurel Mountain site.[10]

Therefore, we hold that pursuant to 38 *C.S.R.* § 2-12.4(c) (1991), the Commissioner of the Division of Environmental Protection has a duty to utilize the proceeds from forfeited bonds to accomplish the completion of reclamation of affected lands of a surface mine.

Consistent with the foregoing, the petitioners' writ of mandamus is granted.[11]

Writ granted.

**10.** The respondent points out that the only proceeds available for reclamation of this site are $3000 in the form of a certified check. While this may not be adequate to accomplish the complete reclamation of the Laurel Mountain site, it does not abrogate the respondent's duty in this case. Accordingly, the respondent will need to take the necessary steps to collect payment on the bonds from their respective sureties. Until that time, the $3000 must be utilized to carry out the respondent's duty.

We note that this case illustrates the need for the bonds to be set at levels that are sufficient to cover the costs associated with accomplishing completion of reclamation.

**11.** The petitioners also assert that under 38 *C.S.R.* § 2-3.25(b) (1991), the respondent has a nondiscretionary duty to correct all outstanding unabated violations of F & M. Specifically, that regulation provides, in part: "Any person who, through whatever means, assumes ownership or control directly or indirectly of a surface mining and reclamation operation shall become responsible for the correction of all outstanding unabated violations." The petitioners argue that because the Division is now the entity responsible for the Laurel Mountain site, then 3.25(b) imposes this duty. However, we need not decide this matter in light of our holding herein.