447 S.E.2d 920

STATE of West Virginia ex rel. WEST VIRGINIA HIGHLANDS CONSERVANCY, INC.; West Virginia Wildlife Federation; West Virginia Council, Trout Unlimited, Inc.; and West Virginia Citizen Action Group, Petitioners,

v.

WEST VIRGINIA DIVISION OF ENVIRONMENTAL PROTECTION and David C. Callaghan, Director of the West Virginia Division of Environmental Protection, in His Official Capacity, Respondents.

No. 22233.

Supreme Court of Appeals of West Virginia.

Submitted June 28, 1994.

Decided July 20, 1994.

Patrick C. McGinley, Morgantown, Phillip B. Scott, Carey, Hill & Scott, Charleston, for petitioners.

Darrell V. McGraw, Jr., Atty. Gen., Russell M. Hunter, Asst. Atty. Gen., Charleston, for respondents.

Robert J. Shostak, Sowash, Carson & Shostak, Athens, amici curiae for Downstream Alliance, Inc., Four–H Road Community Ass'n and Goshen Road Community Ass'n.

W. Henry Lawrence, IV, Robert D. Pollitt, Steptoe & Johnson, Charleston, amici curiae for West Virginia Coal Ass'n and West Virginia Min. and Reclamation Ass'n.

McHugh, Justice:

In this original proceeding, the petitioners, West Virginia Highlands Conservancy, Inc., West Virginia Wildlife Federation, West Virginia Council, Trout Unlimited, Inc., and West Virginia Citizen Action Group (hereinafter "petitioners") seek a writ of mandamus compelling the respondents, the West Virginia Division of Environmental Protection and its Director, David C. Callaghan, (hereinafter "DEP") to acknowledge their mandatory, nondiscretionary duty to treat acid mine drainage (hereinafter "AMD") from bond forfeiture sites and to treat acid mine drainage at the highest priority sites, by any effective means, up to the statutorily established financial limits of the Special Reclamation Fund (hereinafter "SRF").[1]

## I

The provisions of the federal Surface Mining Control and Reclamation Act, 30 U.S.C. 1201, et seq. (hereinafter "SMCRA") and the West Virginia Surface Coal Mining and Reclamation Act, W.Va.Code, 22A–3–1, et seq.[2] (hereinafter "WVSCMRA") are an attempt to deal with the adverse effects of surface and underground coal mining operations on unreclaimed lands. See 30 U.S.C. 1201(c), (h) (1988); W.Va.Code, 22A–3–2(a) [1985]. Among the environmental problems is that of AMD,[3] which pours into West Virginia's streams and lakes from abandoned or forfeited mine sites, destroying aquatic life and impairing the natural beauty and enjoyment of the state's waters.

On December 31, 1993, the DEP submitted to the 1994 legislature an Acid Mine Drainage Bond Forfeiture Report (hereinafter "DEP Report")[4] concerning reclamation costs of treating AMD at bond forfeiture sites. The DEP report identifies 89 abandoned forfeited coal mine sites which currently discharge AMD into West Virginia streams. The DEP further states that bond forfeiture sites account for approximately 10% of the AMD[5] affecting West Virginia's watersheds.

The field study of AMD bond forfeiture sites, which is found in the DEP report, indicates that acid discharge from most sites

---

1. The petitioners raise this particular request for relief in their reply brief.

2. In 1994, the legislature amended and reenacted the WVSCMRA as W.Va.Code, 22–3–1, et seq. In that this opinion is not affected by the 1994 amendments, we will refer to the previous version of WVSCMRA.

3. 38 W.Va.C.S.R. § 2–2.3 (1991) defines "acid mine drainage" as "water discharged from an active, inactive, or abandoned surface mine and reclamation operations or from areas affected by surface mining and reclamation operations with said water having a pH of less than six (6.0) in which total acidity exceeds total alkalinity."

4. In its report, submitted pursuant to 38 W.Va. C.S.R. § 2–12.5.5 (1993) and attached to the petitioners' petition as exhibit 1, the DEP defined "acid mine drainage bond forfeiture sites" as "surface coal mining operations currently producing [AMD] which violate federal and state effluent limitations or applicable water quality standards and which: (1) have had their reclamation bonds forfeited; (2) were not bonded but have been abandoned after August 3, 1977 [the effective date of the SMCRA]; or (3) have a significant likelihood of bond forfeiture."

5. According to the DEP report, approximately 10,000 tons of AMD per year flow into West Virginia waters from bond forfeiture sites.

would require simple chemical treatment systems,[6] while other sites could be controlled by using passive treatment systems.[7] The DEP further states that only a few sites are of high priority, requiring sophisticated chemical treatment facilities.[8] Though the DEP is currently using these and other various methods of abatement, amelioration and prevention of AMD at bond forfeiture sites, it claims that it does not have a legal duty to do so.[9]

## II

A review of the WVSCMRA and its corresponding regulatory scheme [10] is necessary to determine the extent of the DEP's legal duty to abate AMD which flows from forfeited mine sites into the state's lakes and streams.

*W.Va.Code*, 22A–3–8 [1993] prohibits any person from engaging in surface mining operations without a DEP permit. *See also* 30 U.S.C. 1256(a) (1988). A permit application must contain, *inter alia*, the name of the watershed and location of the surface stream into which drainage will be discharged; a determination of the probable hydrologic consequences of the mining and reclamation operations; a map or plan indicating the location of a water treatment facility or drainage system; and a chemical analysis of potentially acid-forming sections of the overburden. *W.Va.Code*, 22A–3–9(a)(10), (11), (13)(L) and (14)(D) [1991].

A permit application must also include a reclamation plan. *W.Va.Code*, 22A–3–9(a)(16) [1991]. Each reclamation plan must demonstrate that reclamation required by WVSCMRA can be accomplished and must include, *inter alia*, "[t]he steps to be taken to comply with applicable air and water quality laws[.]" *W.Va.Code*, 22A–3–10(a)(8) [1991]. Furthermore, 38 West Virginia Code of State Regulations § 2–3.22(f) (1991) [11] states, in relevant part, that each permit application "shall contain a hydrologic reclamation plan" which, *inter alia*, meets "applicable Federal

6. For instance, water-powered systems which dispense calcium carbonate pellets would be adequate.

7. According to the DEP, passive treatment systems use natural processes in wetlands and/or naturally occurring or imported alkaline materials. Though such systems require initial expenditures, they require only minimal ongoing costs for maintenance purposes.

8. The DEP contends that the acid discharge from these few high priority sites may be controlled through "frugal expenditures" from the SRF within the 25% annual proceeds limit. *See W.Va. Code*, 22A–3–11(g) [1990].

9. For example, an actuarial study and audit of the SRF conducted in March of 1993 did not consider the potential liability of the SRF for treating AMD. According to the study, attached to the petitioners' petition as exhibit 3, the DEP apparently informed the accounting firm which performed the study that the DEP had no legal responsibility to treat AMD from forfeited sites with SRF funds. Thus, the report's conclusion that the SRF was "actuarially sound" was reached without consideration of the SRF's potential liability for AMD from bond forfeiture sites.

Furthermore, at a June 24, 1993 meeting concerning the actuarial study mentioned above, the DEP again asserted that it was not required to treat water on bond forfeiture sites and that it was currently treating water at the DLM and F & M mine sites because of *contractual* obligations only. The DLM and F & M sites were those sites which this Court required the DEP to reclaim with forfeited bond proceeds in *State ex rel. Laurel Mountain v. Callaghan*, 187 W.Va. 266, 418 S.E.2d 580 (1992). *See* discussion, *infra*.

Finally, in its December 31, 1993 report to the 1994 legislature, the DEP stated:

The State can decide not to deal with the [AMD] problem on the basis that the costs are prohibitive. This choice would be entirely consistent with state and federal laws, which impose no responsibility on the State for water treatment on bond forfeiture sites.

10. We will also refer to the relevant provisions of the SMCRA, where necessary.

11. The text of 38 W.Va.C.S.R. § 2–3.22(f) (1991) states, in relevant part:

Each permit application shall contain a *hydrologic reclamation plan*. *The plan shall be specific to the local hydrologic conditions.* It shall contain in the form of maps and descriptions the steps to be taken during mining and reclamation through bond release *to minimize disturbances to the hydrologic balance within the permit and adjacent areas;* to prevent material damage outside the permit area; *to meet applicable Federal and State water quality laws and regulations; and to protect the rights of present water users. The plan shall include the measures to be taken to:*

1. *Avoid acid or toxic drainage;*

. . . .

3. *Provide water treatment facilities when needed*[.]

(emphasis added).

and State water quality laws and regulations[.]"[12]

The DEP may not issue a mining and reclamation permit until the applicant files a performance bond covering "that area of land within the permit area upon which the [applicant] will initiate and conduct surface coal mining[13] and reclamation operations" and in an amount "sufficient to assure the completion of the reclamation plan if the work [is] to be performed by the [DEP] in the event of forfeiture[.]" 30 U.S.C. 1259(a) (1988) (footnote added).[14] Under WVSCMRA, the DEP may issue site-specific performance bonds. *W.Va.Code*, 22A–3–11a [1991].[15] The amount of these bonds, which cannot exceed $5,000 per acre, must reflect the various factors which affect the cost of reclamation. *W.Va. Code*, 22A–3–11a(c)(1) and (3) [1991]. One of those factors is "the potential for degrading

or improving water quality." *W.Va.Code*, 22A–3–11a(c)(3)(E) [1991].

As an option to the site-specific bonding program set forth in 30 U.S.C. 1259(a) (1988), the SMCRA allows states to develop an "alternative system that will achieve the objectives and purposes of the bonding program" required by the SMCRA. 30 U.S.C. 1259(c) (1988). As indicated above, those objectives and purposes include sufficient funds to complete reclamation if, in the event the site is forfeited, reclamation must be performed by the DEP.

West Virginia's alternative system, which has been approved by the Office of Surface Mining Reclamation and Enforcement (hereinafter "OSM"),[16] has set the amount of a performance bond at $1000 per acre. *W.Va. Code*, 22A–3–11(a) [1990]. Bond liability continues for the full term of the permit plus

12. The applicable federal and state water quality laws and regulations include the federal Clean Water Act, 33 U.S.C. 1251, *et seq.* and the West Virginia Water Pollution Control Act, *W.Va.Code*, 22–11–1, *et seq.* (This *Code* section, formerly *W.Va.Code*, 20–5A–1, *et seq.*, was amended and reenacted in 1994.)

13. Under the SMCRA, surface coal mining and reclamation operations include surface disturbances as well as surface impacts incident to an underground coal mine. 30 U.S.C. 1291(27) and (28) (1988) (30 U.S.C. 1291 was amended in 1992; however, the amendments do not affect this discussion). Under the WVSCMRA, a "surface impact" from underground mining specifically includes "drainage and discharge therefrom." *W.Va.Code*, 22A–3–3(w)(1) [1991].

14. 30 U.S.C. 1259(a) (1988) provides, in relevant part:

After a surface coal mining and reclamation permit application has been approved but before such a permit is issued, the applicant shall file with the regulatory authority . . . a bond for performance payable, as appropriate, to the United States or to the State, and conditional upon faithful performance of all the requirements of this chapter and the permit. The bond shall cover that area of land within the permit area upon which the operator will initiate and conduct surface coal mining and reclamation operations within the initial term of the permit. . . . The amount of the bond shall be sufficient to assure the completion of the reclamation plan if the work had to be performed by the regulatory authority in the event of forfeiture and in no case shall the bond for the

entire area under one permit be less than $10,000.

15. *W.Va.Code*, 22A–3–11a [1991] provides, in relevant part:
   (a) Notwithstanding the provisions of section eleven [§ 22A–3–11] of this article, the director of the division of environmental protection may establish and implement a site-specific bonding system in accordance with the provisions of this section.
   . . . .
   (c) A legislative rule proposed or promulgated pursuant to this section must provide, at a minimum, for the following:
   (1) The amount of a performance bond shall be not less than one thousand dollars nor more than five thousand dollars per acre or fraction thereof.
   (2) Any such bond, subject to the limitations of subdivision (1) of this subsection, shall reflect a relative potential cost of reclamation associated with the activities proposed to be permitted, which cost would not otherwise be reflected by performance bonds calculated by merely applying a specific dollar amount per acre for all permits.
   (3) Such bond, subject to the provisions of subdivision (1) of this subsection, shall also reflect an analysis under the legislative rule of various factors, as applicable, which affect the cost of reclamation, including, but not limited to: (A) The general category of mining, whether surface or underground; (B) mining techniques and methods proposed to be utilized; (C) support facilities, fixtures, improvements and equipment; (D) topography and geology; and (E) the potential for degrading or improving water quality.

16. *See* 30 C.F.R. § 948.15(c) and (i)(1) (1993).

any additional period necessary to comply with the reclamation plan. *W.Va.Code*, 22A–3–11(b) [1990]. If a performance bond is forfeited and the bond proceeds used by the DEP to complete reclamation are less than the actual cost of reclamation, the DEP is required to utilize monies from the Special Reclamation Fund (hereinafter "SRF") in order to complete reclamation. *W.Va.Code*, 22A–3–11(g) [1990];[17] 38 W.Va.C.S.R. § 2–12.4 (1991).[18] As indicated in *W.Va.Code*, 22A–3–11(g) [1990], our legislature has authorized the expenditure of up to twenty-five percent of the annual amount of the SRF for water quality improvement and, further, has specifically stated that "completion of reclamation" does not occur until "all applicable effluent and applicable water quality stan-

dards are met[.]"[19] 38 W.Va.C.S.R. § 2–2.35 (1991).[20]

In *State ex rel. Laurel Mountain v. Callaghan*, 187 W.Va. 266, 418 S.E.2d 580 (1992), this Court held that, pursuant to 38 W.Va. C.S.R. § 2–12.4(c) (1991),[21] the DEP has a duty to utilize the proceeds from forfeited bonds to accomplish the completion of reclamation. *Id.* at syl. pt. 2. We further indicated that this regulation concerning the use of forfeited bonds to complete reclamation "operates to eliminate acid mine drainage at levels that would violate effluent limitations, thus furthering the legislative finding that 'it is essential to the economic and social well-being of the citizens of the state of West Virginia to strike a careful balance between the protection of the environment and the

**17.** *W.Va.Code*, 22A–3–11(g) [1990] states, in relevant part:

> All special reclamation taxes deposited by the commissioner with the treasurer of the state of West Virginia to the credit of the special reclamation fund prior to the effective date of this article shall be transferred to the special reclamation fund created by this section and shall be expended pursuant to the provisions of this subsection: ... The moneys accrued in the fund, including interest, are reserved solely and exclusively for the purposes set forth in this subsection. The fund shall be administered by the commissioner, and he is authorized to expend the moneys in the fund for the reclamation and rehabilitation of lands which were subjected to permitted surface-mining operations and abandoned ... where the amount of the bond posted and forfeited on such land is less than the actual cost of reclamation. The commissioner shall develop a long-range planning process for selection and prioritization of sites to be reclaimed so as to avoid inordinate short-term obligations of the assets in the fund of such magnitude that the solvency of the fund is jeopardized. The Commissioner may use an amount, not to exceed twenty-five percent of the annual amount of the fees collected, for the purpose of designing, constructing and maintaining water treatment systems when they are required for a complete reclamation of the affected lands described in this subsection.

**18.** The relevant portion of 38 W.Va.C.S.R. § 2–12.4(d) (1991) provides:

> (d) Where the proceeds of bond forfeiture used by the Commissioner to complete reclamation are less than the actual cost of reclamation:
> (1) The permittee shall be liable for all reclamation costs, and the Commissioner shall col-

lect from the permittee all costs in excess of the amount forfeited; or
> (2) Notwithstanding efforts by the Commissioner to collect the costs from the permittee, the Commissioner shall in a timely manner, but not later than one hundred eighty (180) days after forfeiture of the site-specific bonds utilize monies in the Special Reclamation Fund created by subsection (g), Section 11 of the Act, to accomplish the completion of reclamation, including the requirements of Section 23 of the Act and subsection 14.5 of these regulations governing water quality.

**19.** Under the WVSCMRA and its regulatory scheme, whether an applicant files a site-specific performance bond, under *W.Va.Code*, 22A–3–11a [1991] (where the cost of reclamation must reflect the potential for degrading or improving water quality) or a performance bond under West Virginia's alternative bonding system, pursuant to *W.Va.Code*, 22A–3–11 [1990] (where up to 25% of the SRF may be used for water treatment systems when required for the completion of reclamation), clearly the protection of the state's waters from the effects of mining is considered a part of reclamation.

**20.** 38 W.Va.C.S.R. § 2–2.35 (1991) states: *"Completion of Reclamation* means that all terms and conditions of the permit have been satisfied, the final inspection report has been approved by the Commissioner, that all applicable effluent and applicable water quality standards are met, and the total bond has been released."

**21.** 38 W.Va.C.S.R. § 2–12.4(c) (1991) reads: "Where the bond is forfeited, the proceeds shall be used by the Commissioner to accomplish the completion of reclamation, including the requirements of Section 23 of the Act and subsection 14.5 of these regulations governing water quality."

economical mining of coal needed to meet energy requirements.' *W.Va.Code,* 22A–3–2 [1985]." *Id.* at 270, 418 S.E.2d at 584 (footnote omitted).

In *Laurel Mountain,* we indicated that 38 W.Va.C.S.R. § 2–12.4(d) (1991) [22] did not apply to that case and, consequently, we did not address the question of whether the DEP has a mandatory, nondiscretionary duty to use funds from the SRF to treat AMD.[23] However, we did indicate that the treatment of AMD was a component of reclamation, a conclusion clearly supported by *W.Va.Code,* 22A–3–9 [1991], 38 W.Va.C.S.R. § 2–2.35 (1991) [24] and 38 W.Va.C.S.R. § 2–3.22(f) (1991).[25] The treatment of AMD is a component of reclamation and the DEP has a mandatory duty to use the proceeds from forfeited bonds to complete reclamation. It follows, therefore, that the DEP has a similar mandatory duty to treat AMD, when it is required for reclamation, with up to the statutorily established financial limit of 25% of the annual amount in the SRF. *W.Va.Code,* 22A–3–11(g) [1990]. We recognize that funds annually available in the SRF are limited [26] and that the costs of treating AMD from forfeited mine sites may exceed the 25% of the SRF allotted for the treatment of water

systems. Therefore, the DEP, in its discretion, is entitled to prioritize those AMD bond forfeiture sites which it deems to be in the most need of treatment and to expend the available money in the SRF accordingly.[27]

We hold, therefore, that pursuant to *W.Va. Code,* 22A–3–11(g) [1990] and 38 W.Va.C.S.R. § 2–12.4(d) (1991), the DEP has a mandatory, nondiscretionary duty to utilize moneys from the SRF, up to 25% of the annual amount, to treat AMD at bond forfeiture sites when the proceeds from forfeited bonds are less than the actual cost of reclamation. However, when the cost of treating AMD at these sites is greater than the amount of funds available in the SRF, the DEP may expend the available funds in the SRF at the highest priority sites.

Consistent with the foregoing, the petitioners' writ of mandamus is hereby granted.

Writ granted.

---

**22.** *See* n. 18, *supra.*

**23.** The DEP's contention that 38 W.Va.C.S.R. § 2–12.4(d) (1993) does not impose a mandatory, nondiscretionary duty on the DEP to utilize money from the SRF to complete reclamation at all bond forfeiture sites, including AMD treatment and abatement, is without merit. The 1993 version of that regulation must be approved by the OSM to be effective. 30 C.F.R. § 732.17(g) (1993) provides:

> Whenever changes to laws or regulations that make up the approved State program are proposed by the State, the State shall immediately submit the proposed changes to the Director as an amendment. No such change to laws or regulations shall take effect for purposes of a State program until approved as an amendment.

The OSM has not approved the 1993 version of that regulation.

**24.** *See* n. 20, *supra.*

**25.** *See* n. 9, *supra.*

**26.** The SRF is funded by a tax upon coal surface-mining operators of three cents per ton of coal mined. *W.Va.Code,* 22A–3–11(g) [1990]. The legislature appropriated approximately $9 million to the SRF for 1994.

**27.** *W.Va.Code,* 22A–3–11(g) [1990] provides, in relevant part, that "[t]he commissioner shall develop a long-range planning process for selection and prioritization of sites to be reclaimed so as to avoid inordinate short-term obligations of the assets in the fund of such magnitude that the solvency of the fund is jeopardized."