PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

WEST VIRGINIA HIGHLANDS
CONSERVANCY, INCORPORATED;
WEST VIRGINIA RIVERS COALITION,

        *Plaintiffs-Appellees,*

v.

RANDY C. HUFFMAN, Secretary,
West Virginia Department of
Environmental Protection,

        *Defendant-Appellant.*

No. 09-1474

INTERSTATE MINING COMPACT
COMMISSION,

    *Amicus Supporting Appellant.*

Appeal from the United States District Court
for the Northern District of West Virginia, at Clarksburg.
Irene M. Keeley, District Judge.
(1:07-cv-00087-IMK)

Argued: September 21, 2010

Decided: November 8, 2010

Before WILKINSON, SHEDD, and DUNCAN,
Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the
opinion, in which Judge Shedd and Judge Duncan joined.

**COUNSEL**

**ARGUED**: Benjamin L. Bailey, BAILEY & GLASSER, LLP, Charleston, West Virginia, for Appellant. James M. Hecker, PUBLIC JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Raymond S. Franks, WEST VIRGINIA DEPARTMENT OF ENVIRONMENTAL PROTECTION, Charleston, West Virginia, for Appellant. Joseph M. Lovett, Derek Teaney, APPALACHIAN CENTER FOR THE ECONOMY AND THE ENVIRONMENT, Lewisburg, West Virginia, for Appellees. Gregory E. Conrad, Executive Director, INTERSTATE MINING COMPACT COMMISSION, Herndon, Virginia; Richard S. Morrison, Assistant Counsel, COMMONWEALTH OF PENNSYLVANIA, Department of Environmental Protection, Harrisburg, Pennsylvania, for Amicus Supporting Appellant.

---

**OPINION**

WILKINSON, Circuit Judge:

The West Virginia Department of Environmental Protection ("WVDEP") appeals an injunction requiring it to obtain National Pollutant Discharge Elimination System permits under the Clean Water Act ("CWA"), *see* 33 U.S.C. § 1342 *et seq.*, for reclamation efforts at abandoned coal mining sites. The injunction was based on the district court's conclusion that the plain language of the CWA and applicable EPA regulations require such a permit.

The trial court's ruling was correct. The text of the CWA, as well as the corresponding regulations issued by the Environmental Protection Agency, confirm that the permit requirements apply to anyone who discharges pollutants into the waters of the United States. Under the CWA, it does not matter that a mining company may have created the conditions

that call for reclamation. What matters is that an entity, private or public, is currently discharging pollutants into the waters of the United States. In fact, the statute contains no exceptions for state agencies engaging in reclamation efforts; to the contrary, it explicitly includes them within its scope.

At bottom, WVDEP's arguments stem from little more than policy disagreements with the statutory text. Finding that to be an insufficient basis for deviating from the law as written, we affirm the judgment of the district court.

I.

A.

Congress enacted the Federal Water Pollution Control Act Amendments of 1972, better known as the Clean Water Act ("CWA"), in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." Pub. L. No. 92-500, 86 Stat. 816 (codified as amended at 33 U.S.C. § 1251 *et seq.*). In furtherance of those goals, the CWA bans, among other things, "the discharge of any pollutant by any person." 33 U.S.C. § 1311(a). On its face, the ban is sweeping in scope: the Act defines "person" to include not just private individuals and companies, but also states and municipalities, *see* 33 U.S.C. § 1362(5), and covers "any addition of any pollutant to navigable waters from any point source," *see* 33 U.S.C. § 1362(12)(A).

In the coal industry, "the discharge of . . . pollutant[s]" occurs frequently. The mining process often contaminates water associated with the mine site (such as stormwater or wastewater) with pollutants like iron and manganese. This polluted water is known as "acid mine drainage" because mining makes the water quite acidic, often decreasing the pH to well below 6.0. Under the pH scale, a pH of 7.0 is neutral, a pH of less than 7.0 is acidic, and a pH of greater than 7.0 is basic. The fact that acid mine drainage has a pH of at most

6.0 means that it is substantially more acidic than a neutral solution.

Of course, the CWA does not set out to ban coal mining. Instead, it allows mining companies to apply for pollution permits, known as National Pollutant Discharge Elimination System ("NPDES") permits. These permits set forth limitations on the type and quantity of pollutants that will ultimately be released into navigable waters. *See S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe*, 541 U.S. 95, 102 (2004); *Natural Res. Def. Council v. Costle*, 568 F.2d 1369, 1375 (D.C. Cir. 1977) (observing that the permit scheme recognizes that "pollution continues because of technological limits, not because of any inherent rights to use the nation's waterways for the purpose of disposing of wastes."). While NPDES permits are normally issued by the EPA, states can petition to run their own NPDES permit programs. *See* 33 U.S.C. §§ 1342(a)-(b). In administering these programs, states are free to treat the EPA's pollution limits as a floor and impose more stringent requirements. *See* 40 C.F.R. §§ 123.1(i)(1), 123.25. Once an NPDES permit has been issued, however, the state, the EPA, and citizens alike can sue to enforce it. *See* 33 U.S.C. §§ 1319(a)(3) (EPA enforcement), 1365(a) (citizen-suit provision).

West Virginia has successfully petitioned to run its own NPDES permit program, meaning that putative mine operators must apply to the West Virginia Department of Environmental Protection ("WVDEP") rather than the EPA.[1] *See* 47

---

[1]Under the federal Surface Mining Control and Reclamation Act of 1977 ("SMCRA"), Pub. L. No. 95-87, 91 Stat. 447, codified at 30 U.S.C. § 1201 *et seq.*, mining companies must also obtain a general permit for mining operations. *See* 30 U.S.C. § 1256. As a baseline rule, these permits are issued by the federal Office of Surface Mining Reclamation and Enforcement (known as "OSM"). *Id.* Yet states can petition to exercise exclusive regulatory jurisdiction over coal mining so long as they agree to and can enforce the minimum standards set forth in SMCRA. *See* 30 U.S.C. § 1253(a). West Virginia has successfully petitioned to administer its own program, and WVDEP manages this permit scheme as well. *See* 30 C.F.R. § 948.10.

Fed. Reg. 22363 (May 24, 1982) (approving West Virginia's program); W. Va. Code R. § 47-10-1 *et seq.* (setting forth regulations governing NPDES program). Because acid mine drainage is one of the most serious water quality problems facing West Virginia, its NPDES permits carry a corresponding obligation to neutralize the adverse effects of the effluent. *See* W. Va. Code R. § 22-3-9(a)(16) (requiring the submission of a reclamation plan along with a permit application); *id.* at § 22-3-10 (outlining reclamation plan requirements). In other words, mine operators must raise the overall pH level and reduce the harmful chemical levels in the acid mine drainage. West Virginia, however, does not just blindly trust the mine operators to carry out their obligations. Instead, as a condition of receiving their permits, mine operators must post bonds with the state designed to guarantee their compliance. *See* W. Va. Code § 22-3-11(a). If the mine operators default on their duties, WVDEP can revoke the permits and force the performance bonds into forfeiture. *See* W. Va. Code § 22-3-17(b).

The consequences of revocation are what bring this case before us. State regulations require WVDEP to treat acid mine drainage at bond forfeiture sites in accordance with the EPA's effluent limitations for coal mining point sources and "applicable water quality standards." W. Va. Code R. § 38-2-12.5.e (referencing standards set forth in 40 C.F.R. § 434); *see id.* at § 38-2-12.4.b. The EPA limitations are known as "technology-based" limitations because they are predicated upon the "best practicable" known technologies for treatment. 40 C.F.R. § 434.32. Based on average daily emissions, these standards require, among other things, a pH level between 6.0 to 9.0, an iron concentration of no more than 3 mg/l of effluent, and a manganese concentration of at most 2 mg/l. *See* 40 C.F.R. § 434.35. These limits are stringent, but ultimately less so than West Virginia's applicable water quality standards, as the state has decided to require iron and manganese limitations that are twice as strict (1.5 mg/l and 1.0 mg/l, respectively). *See* W. Va. Code R. § 47-2, app. E, tbl.1, parameters 8.15, 8.17.

According to WVDEP's own regulations, WVDEP must meet these standards by taking "the most effective actions possible to remediate acid mine drainage, including chemical treatment where appropriate, with the resources available." W. Va. Code R. § 38-2-12.4.c. Generally speaking, WVDEP initially employs the existing treatment system as a temporary salve and then installs a series of water wheels that mechanically release neutralizing agents. That system increases the pH of the water out of the acidic range and precipitates out the harmful chemicals. In short, it is intended to turn acid mine drainage back into normal water.

As effective as this treatment may be, it is not cheap. WVDEP's regulations require the agency to direct the entire proceeds of the forfeited penal bond towards reclamation. W. Va. Code R. § 38-2-12.4.b. Often, the bond proceeds are insufficient; in such circumstances, WVDEP must continue treatment by drawing upon the Special Reclamation Fund ("SRF"). W. Va. Code R. § 38-2-12.4.d; *see also West Virginia ex rel. W. Va. Highlands Conservancy, Inc. v. WVDEP*, 447 S.E.2d 920, 925 (W. Va. 1994) (holding that duty to expend SRF funds is "mandatory" and "nondiscretionary"); 67 Fed. Reg. 37610, 37612 (May 29, 2002) (removing limitations on expenditure of funds). The SRF is funded by a tax on coal mined throughout the state. W. Va. Code §§ 22-3-11(g), -11(h)(1) (setting tax at 14.4 cents/ton).

B.

The dispute before us stems from WVDEP's reclamation efforts at several bond forfeiture sites in Preston, Monongalia, and Upshur counties in north central West Virginia. In 2007, the West Virginia Highlands Conservancy and West Virginia Rivers Coalition (collectively, "the Conservancy") requested water quality data from those sites. Based on the data, the Conservancy determined that there were eighteen bond forfeiture sites in northern West Virginia that were actively discharging acid mine drainage into state streams.

In 2007, the Conservancy filed suit in the United States District Court for the Northern District of West Virginia under the CWA's citizen-suit provision. *See* 33 U.S.C. § 1365. The lawsuit sought declaratory and injunctive relief requiring WVDEP to obtain NPDES permits at the bond forfeiture sites within thirty days.[2] According to the Conservancy, it was not enough for WVDEP to comply with its state regulatory mandate to "take the most effective actions possible to remediate acid mine drainage." *See* W. Va. Code R. § 38-2-12.4.c. Instead, WVDEP had to obtain NPDES permits for the bond forfeiture sites because it was violating the CWA by discharging pollutants into navigable waters. *See* 33 U.S.C. §§ 1311, 1362(12)(A).

After the suit was filed, WVDEP stipulated that the pH, iron, manganese, and aluminum levels in the water at the sites frequently exceeded both the EPA technology-based and West Virginia water quality standards. It also stipulated that those chemicals are pollutants under the CWA and that they are being discharged into navigable waters. At his deposition, WVDEP's designated representative Larry Ellison further acknowledged that the pollutant levels at the sites would not meet the West Virginia water quality standards and admitted that the discharge points have "the physical characteristics of a point source" under the CWA. Ellison also conceded that WVDEP had not issued itself any permits for the eighteen bond forfeiture sites despite having issued permits to the former site operators when the sites were active. In recent history, in fact, WVDEP has issued itself only one permit for a bond forfeiture site, and only did so after being sued by the

---

[2]The Conservancy also filed a companion suit in the United States District Court for the Southern District of West Virginia based on elevated pollutant levels at three bond forfeiture sites in that portion of the state. The Conservancy successfully moved for summary judgment in August 2009. *See W. Va. Highlands Conservancy v. Huffman*, 651 F. Supp. 2d 512 (S.D. W.Va. 2009). On August 31, 2009, the court issued a judgment requiring WVDEP to file NPDES permit applications within 180 days and obtain those permits within 360 days.

Conservancy and receiving a letter from the EPA stating that a permit was required.

Notwithstanding these facts, WVDEP maintained that NPDES permits were unnecessary for bond forfeiture sites.[3] On its view, permits are simply not necessary for state agencies cleaning up acid mine drainage generated by others. Unpersuaded, the Conservancy moved for summary judgment in August 2008. The district court granted the motion on January 14, 2009. After additional briefing on the timing of injunctive relief, the court issued a final judgment on March 26, 2009 ordering WVDEP to apply for permits within 180 days and obtain final permits within 360 days. This appeal followed.[4]

## II.

WVDEP's chief obstacle in this appeal is that the Clean Water Act is a broadly worded statute. *See Rapanos v. United States*, 547 U.S. 715, 723 (2006) (plurality opinion) (the terms "discharge of a pollutant" and "pollutant" in Section 1311(a) are "defined broadly"); *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 133 (1985) ("Congress chose to define the waters covered by the Act broadly."). The plain text bears this point out, declaring that "the discharge of *any*

---

[3]WVDEP also argued that the Conservancy's suit "constitutes a raid on the State treasury in violation of the Eleventh Amendment," and it renews that argument here. We disagree. Under *Ex parte Young*, 209 U.S. 123 (1908), the Conservancy can sue Secretary Huffman to secure WVDEP's prospective compliance with the law. Indeed, under longstanding Supreme Court precedent, the financial burdens of compliance with prospective decrees raise no Eleventh Amendment concerns. *See Milliken v. Bradley*, 433 U.S. 267, 288-90 (1977); *Edelman v. Jordan*, 415 U.S. 651, 666-68 (1974). In any event, the burdens WVDEP foresees are speculative at this point; this suit is merely about whether or not WVDEP has to obtain permits.

[4]WVDEP has issued draft permits and the EPA has commented on them, but WVDEP has not yet issued final permits.

pollutant by *any* person shall be unlawful." 33 U.S.C. § 1311(a) (emphasis added). The definitions do the same: the CWA defines "person" to include states, municipalities, and political subdivisions of a State, 33 U.S.C. § 1362(5), and describes a point source as "*any* discernible, confined and discrete conveyance," *see* 33 U.S.C. § 1362(14) (emphasis added). Lest there be any remaining doubt about the CWA's scope, the definition of "discharge of a pollutant" resolves it: according to that provision, the CWA bans "*any* addition of *any* pollutant to navigable waters from *any* point source." *See* 33 U.S.C. § 1362(12)(A) (emphasis added). "Any" is a powerful statutory term. The Clean Water Act uses it frequently.

At first blush, WVDEP's conduct at bond forfeiture sites appears covered by these provisions. As a political subdivision of West Virginia, WVDEP is a "person" under the CWA. *See* 33 U.S.C. § 1362(5). WVDEP has stipulated that water is being "discharge[d]" at the bond forfeiture sites, and that the water contains "pollutant[s]." 33 U.S.C. § 1311(a). WVDEP's designated representative has further acknowledged that the outfalls from these sites have "the physical characteristics of a point source" and that permits would be required if the mines were still privately owned. And the parties have agreed that the receiving streams are "water[s] of the United States as defined at 33 U.S.C. § 1362(7)." Put together, these facts establish that WVDEP is a person proceeding in violation of § 1311(a) by discharging pollutants into navigable waters from a point source. As a result, WVDEP must obtain NPDES permits for the bond forfeiture sites.

As if the statutory language were not clear enough, the applicable EPA regulations confirm that WVDEP needs to obtain NPDES permits. The EPA has issued a series of regulations addressing the operations of the NPDES permit scheme. *See* 40 C.F.R. § 122.1 *et seq.* Those regulations define the term "person" to include state agencies. *See* 40 C.F.R. § 122.2. They also confirm the broad reach of the term "discharge of a pollutant," which, under the regulations, "in-

cludes additions of pollutants into waters of the United States from . . . surface runoff which is collected or channeled by man" and "discharges through pipes, sewers, or other conveyances owned by a State, municipality, or other person which do not lead to a treatment works." 40 C.F.R. § 122.2; *see also id.* (defining a "[p]rivately owned treatment works" as "any device or system which is (a) used to treat wastes from any facility whose operator is not the operator of the treatment works and (b) not a 'POTW'"); 40 C.F.R. § 403.3 (defining a "POTW" or "Publicly Owned Treatment Works" as "a treatment works . . . which is owned by a State or municipality").

What is more, the EPA issued regulations in 1985 establishing that post-mining discharges are covered by the NPDES scheme. *See* 50 Fed. Reg. 41296 (Oct. 9, 1985). In those regulations, the EPA "reemphasize[d] that post-bond release discharges are subject to regulation under the Clean Water Act," observing that "[i]f a point source discharge occurs after bond release, then it must be regulated through an NPDES permit." *Id.* at 41298. The comments to the rule sharpen this point, flatly stating that "*[a]ny* point source discharge after bond release does require a permit." *Id.* at 41304 (emphasis added). To the extent parties do not comply, the regulations state that they will be "subject to enforcement action by EPA under section 309 of the Act and by citizens under section 505(a)(1) of the Act." *Id.* at 41298. While these regulations explicitly address situations where a bond is released rather than forfeited to the state, the EPA's intent is pellucid. Both those who generate pollution and those who superintend ongoing discharges must obtain NPDES permits.

## III.

WVDEP, however, advances a welter of arguments for why it should not have to obtain NPDES permits. We shall address them in turn.

A.

First, WVDEP argues that it should be exempt from the NPDES scheme because it is a state agency engaging in reclamation efforts rather than a private company intentionally discharging pollutants. But both the text of the CWA and the EPA's implementing regulations squarely reject any exemption for state agencies like WVDEP. *See* 33 U.S.C. § 1362(5) (defining "person" as both a "State" and a "political subdivision of a State"); 40 C.F.R. § 122.2 (defining a person as, among other things, a "State or Federal agency"). Indeed, the regulations describing the content of a permit application require the operator to disclose its "status as Federal, *State*, private, public, or other entity," thus denoting that state agencies are covered by the Act. 40 C.F.R. § 122.21(f)(4) (emphasis added).

Moreover, the statute contains no exemption for reclamation efforts; to the contrary, it bans "the discharge of *any* pollutant by *any* person," regardless of their motives. 33 U.S.C. § 1311(a) (emphasis added). Nonetheless, amicus Interstate Mining Compact Commission ("IMCC") argues that the word "addition" in the definition of "discharge of a pollutant" implies "agency, i.e., responsibility for creating the polluting condition" and excludes "actions which actually *reduce* the load of pollutants which will enter the receiving surface water." However, the word "addition," in context, means something different from what IMCC suggests. By defining "discharge of a pollutant" as "*any* addition of *any* pollutant to navigable waters from *any* point source," 33 U.S.C. § 1362(A) (emphasis added), the statute clearly covers all additions – no matter how small – rather than merely net additions. In other words, "[t]he Act does not impose liability only where a point source discharge creates a net increase in the level of pollution. Rather, the Act categorically prohibits any discharge of a pollutant from a point source without a permit." *Comm. to Save Mokelumne River v. E. Bay Mun. Util. Dist.*, 13 F.3d 305, 309 (9th Cir. 1993). Indeed, WVDEP itself

offers no serious response to this textual reality; to the contrary, it concedes that "some entity will always be responsible for obtaining an NPDES permit when discharges requiring a permit are occurring."

The regulations are fatal to WVDEP's position in other ways as well. 40 C.F.R. § 122.3 sets forth a list of "[e]xclusions" from the NPDES permit requirement, but none of them come close to covering WVDEP. Nevertheless, WVDEP urges us to find its conduct covered by the Water Transfers Rule, which states that no permit is required for "activity that conveys or connects waters of the United States without subjecting the transferred water to intervening industrial, municipal, or commercial use." 40 C.F.R. § 122.3(i). But that exception only applies when pollutants are transferred from one navigable water to another. 73 Fed. Reg. 33697, 33699 (June 13, 2008) ("[T]he water being conveyed must be a water of the U.S. prior to being discharged to the receiving waterbody."); *see also Friends of the Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1227 (11th Cir. 2009) ("[T]he EPA's [water transfer] regulation . . . accepts the unitary waters theory that transferring pollutants between navigable waters is not an 'addition . . . to navigable waters.'"). Here, by contrast, neither the acid mine drainage nor the bond forfeiture sites constitute "navigable waters." *See* 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2. More importantly, the defendants were not "transferring" pollutants; they were discharging them. Any other construction would vitiate the Act.

## B.

WVDEP also argues strenuously that it should not have to obtain NPDES permits because it did not cause the discharges in the first place. On WVDEP's view, the only parties that need to obtain NPDES permits are the mining companies who commence operations at new locations and set new discharges in motion. WVDEP argues that those parties must continue to pay daily civil penalties and cleanup costs even after their per-

mit has expired, *see* W. Va. Code § 22-11-22(a); W. Va. Code R. § 38-2-12.4.e, meaning that WVDEP need not obtain permits of its own.

This argument flounders for several reasons. First, and most importantly, there is simply no causation requirement in the statute. On its face, 33 U.S.C. § 1311(a) bans "the discharge of any pollutant by any person" regardless of whether that "person" was the root cause or merely the current superintendent of the discharge. In other words, the statute takes the water's point of view: water is indifferent about who initially polluted it so long as pollution continues to occur.

The EPA's regulatory interpretations of the statute confirm this point. The regulations make plain that it is the current operator of a mine site, rather than the initial owner, who must obtain a permit. *See* 40 C.F.R. § 122.21(b) ("When a facility or activity is owned by one person but is operated by another person, it is the operator's duty to obtain a permit."). This provision seems to confirm that where, as here, the mine owner generates pollution but then abandons the site, the subsequent operator is the party responsible for obtaining a permit.

Further evidence against WVDEP's position comes from the NPDES permits themselves. In West Virginia, the water quality standards limit the overall levels of individual pollutants in the water rather than solely limiting the addition of new pollution. *See, e.g.*, W. Va. Code R. § 47-2, app. E, tbl.1, parameters 8.15, 8.17. The technology-based standards set forth by the EPA do the same thing. *See* 40 C.F.R. §§ 434.32, 434.35. The system Congress enacted thus allows the EPA and the states to regulate overall pollutant levels without regard to who generated that pollution.

To be sure, Congress could have mandated a scheme much more amenable to WVDEP's arguments. For example, Congress could have required permits only where a new mine

operator increases pollution levels over and above those of the previous operator. But Congress did not do that, perhaps because a causation approach would eliminate all accountability for states engaging in cleanup efforts, as they did not generate the pollution in the first place, or because a causation requirement would allow for all manner of gamesmanship among polluters: so long as a mining company could argue it was not the root cause of pollution, it too would be free from permit requirements. Whatever the reason, we take the statute as it is, not as WVDEP wishes it would be.

Unsurprisingly, the case law has likewise rejected WVDEP's proposed causation requirement. In *United States v. Law*, 979 F.2d 977, 978 (4th Cir. 1992), we affirmed Law's conviction for knowingly discharging pollutants into the waters of the United States without an NPDES permit. Law's offense was based on his failure to operate a water treatment system effectively. *Id.* While Law had not generated the pollution being discharged from his collection and treatment ponds, he was nevertheless held liable for allowing those pollutants to leach into navigable waters. *Id.* at 979 ("The origin of pollutants in the treatment and collection ponds is therefore irrelevant. The proper focus is upon the discharge from the ponds."). In other words, root causation was irrelevant. Other circuits are in accord. *See Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1143 (10th Cir. 2005) ("[T]he liability and permitting sections of the [CWA] focus on the point of discharge, not the underlying conduct that led to the discharge."); *Mokelumne River*, 13 F.3d at 309 (same).

Finally, in *South Florida Water Management District v. Miccosukee Tribe*, the Supreme Court rejected as "untenable" the argument that NPDES permits are only required when a pollutant "originates from the point source." 541 U.S. 95, 104-05 (2004). To the contrary, the Court determined that permits are required for discharges from point sources "that do not themselves generate pollutants" but merely "convey [pollutants] to 'navigable waters.'" *Id.* at 105. Indeed, the

Court noted that "one of the [CWA's] primary goals was to impose NPDES permitting requirements on municipal wastewater treatment plants," and rejected any proposed interpretation of the Act that would "not cover such plants" on the theory that they merely "treat and discharge pollutants added to water by others." *Id.* Together, *Law*, *El Paso*, *Mokelumne River*, and *Miccosukee Tribe* make clear that under the CWA, the question of who generated pollutants is irrelevant. What matters is who is currently discharging pollutants into navigable waters.

C.

We turn next to WVDEP's contention that the district court's position compels "absurd" results. According to WVDEP, it would be "ridiculous, surreal, and downright perverse" to make WVDEP "apply to itself for permits, issue the permits to itself, then police the agency's own inevitable violations."

It is difficult to understand why that is the case. Most large departments have different branches or divisions, and those divisions perform different functions. WVDEP is no exception; it has, among other divisions, a Division of Land Restoration that administers cleanup programs, a Division of Mining and Reclamation that reviews and issues permits for mine sites, and a Division of Environmental Enforcement that enforces permits. In fact, WVDEP previously applied to itself for an NPDES permit for the Alton project, a bond forfeiture site in Upshur County. By all accounts, the agency had no problem evaluating the application and issuing the permit. Moreover, WVDEP has stipulated that NPDES permits were necessary for the bond forfeiture sites at issue here when they were being actively mined. As WVDEP has assumed control over the mines, it should be bound by the very same obligation. Of course, WVDEP might have a compelling argument for differential treatment if there was some statutory basis for it. But there is none.

Nor is it "absurd" for WDVEP to enforce permits against itself. If the agency can issue itself permits, it can just as easily monitor them. And to whatever extent WVDEP is reluctant to do so, the CWA provides ample mechanisms for other parties to fill the void. For example, the EPA could bring an enforcement action against WVDEP under 33 U.S.C. § 1319(a)(3). Similarly, an environmental group could file suit under the CWA's citizen-suit provision, just as the Conservancy did here. *See* 33 U.S.C. § 1365(a). Viewed from that perspective, the fact that WVDEP might feel uncomfortable enforcing permits against itself is hardly a reason to exempt it from the permit scheme in the first place.

D.

WVDEP's final contention is that it would be futile to require it to obtain NPDES permits because it simply cannot comply with them. After all, the agency already struggles to meet the EPA's technology-based standards. Moreover, argues WVDEP, the hefty costs of attempting to meet the permit requirements might lead the state to abandon reclamation efforts altogether. Amicus IMCC elaborates on these "serious negative consequences" of requiring NPDES permits, arguing that such an approach would result in "more pollutants entering the Nation's waters," both by increasing the serious financial and administrative burdens on the state and by discouraging volunteer "good Samaritans" from entering into "public/private partnerships" at bond forfeiture sites for fear of "incurring liability and having to defend against lawsuits by third parties for failure to meet NPDES permit requirements."

These arguments get things backwards. For one thing, these consequences are as of now largely speculative. The sky did not fall when WVDEP had to obtain an NPDES permit for the Alton project site, and for all of WVDEP's and IMCC's cataclysmic predictions, we may not assume the sky will fall now. More importantly, we are not in the business of rewriting laws

whenever parties allege it is difficult to comply with them. Exempting the state on those grounds risks sending the wrong message to mining companies: don't bother complying with the permits, because the state won't either.

Moreover, these arguments about the heavy burdens imposed by the permit program are hardly novel. Any time Congress imposes a permit scheme, some regulated entities will complain that the permits impose onerous costs and will lead to all manner of hazardous consequences. Here, Congress has determined that a permitting scheme is the crucial instrument for protecting natural resources. It is for Congress to weigh the consequences of compliance with the laws it enacts. In passing the NPDES scheme, Congress considered the costs and decided that the benefits were worth it. If Congress somehow struck the balance wrong, it is for Congress to correct it.

## IV.

In sum, WVDEP's state law obligations to take over bond forfeiture sites and engage in reclamation efforts invoke Clean Water Act obligations to obtain NPDES permits. Permit requirements are often, and sometimes understandably, a source of discomfort for those required to obtain them. If so, West Virginia can attempt to ease the burdens it foresees. It can petition Congress or the EPA to create exceptions to the CWA for states that move to ameliorate the problems private companies leave behind. Or WVDEP can address the other side of the equation and increase the funds available for reclamation, either by raising the SRF tax on coal or enlarging the bonds mining companies must post before beginning their work.

Instead of availing itself of these various options, however, WVDEP asks us to bring about the very same results by misconstruing the Clean Water Act. There are better audiences for that invitation. We therefore affirm the judgment of the district court.

*AFFIRMED*