PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

OHIO RIVER VALLEY ENVIRONMENTAL
COALITION, INCORPORATED; HOMINY
CREEK PRESERVATION ASSOCIATION,
INCORPORATED; CITIZENS COAL
COUNCIL,

*Plaintiffs-Appellees,*

v.

DIRK KEMPTHORNE, Secretary of the
Interior,

*Defendant-Appellant.*

No. 06-1122

Appeal from the United States District Court
for the Southern District of West Virginia, at Huntington.
Robert C. Chambers, District Judge.
(3:04-cv-00084)

Argued: September 18, 2006

Decided: December 12, 2006

Before WILLIAMS, Circuit Judge,
HAMILTON, Senior Circuit Judge, and
Richard L. VOORHEES, United States District Judge
for the Western District of North Carolina,
sitting by designation.

Affirmed by published opinion. Judge Williams wrote the opinion, in
which Senior Judge Hamilton and Judge Voorhees joined.

**COUNSEL**

**ARGUED:** Allen M. Brabender, UNITED STATES DEPARTMENT OF JUSTICE, Environment & Natural Resources Division, Washington, D.C., for Appellant. Walton Davis Morris, Jr., Charlottesville, Virginia, for Appellees. **ON BRIEF:** Steven C. Barcley, UNITED STATES DEPARTMENT OF THE INTERIOR, Office of the Solicitor, Pittsburgh, Pennsylvania; Sue Ellen Wooldridge, Assistant Attorney General, Kathryn E. Kovacs, Ruth Ann Storey, UNITED STATES DEPARTMENT OF JUSTICE, Environment & Natural Resources Division, Washington, D.C., for Appellant. Charles M. Kincaid, Huntington, West Virginia, for Appellees.

---

**OPINION**

WILLIAMS, Circuit Judge:

The Secretary of the Interior[1] appeals the district court's grant of summary judgment in favor of Ohio River Valley Environmental Coalition, Inc., Hominy Creek Preservation Association, Inc., and Citizens Coal Council (collectively "OVEC") in an action alleging that the Secretary's approval of amendments to West Virginia's regulatory program for surface coal mining violated the Administrative Procedure Act ("APA"), 5 U.S.C.A. § 500 *et seq.* (West 1996), and the Surface Mining Control and Reclamation Act of 1977 ("SMCRA"), 30 U.S.C.A. § 1201 *et seq.* (West 1986 & Supp. 2006). Because the Secretary's decision to approve the amendments was arbitrary and capricious, we affirm.

I.

A.

West Virginia developed its state program for the control of surface

---

[1]OVEC sued former Secretary of the Interior Gail Norton in her official capacity. This court substituted the current Secretary, Dirk Kempthorne, as the named defendant on appeal.

coal mining pursuant to SMCRA, which regulates surface coal mining through a cooperative federalism approach. "Under this scheme, Congress established in SMCRA minimum national standards for regulating surface coal mining and encouraged the States, through an offer of exclusive regulatory jurisdiction, to enact their own laws incorporating these minimum standards, as well as any more stringent, but not inconsistent, standards that they might choose." *Bragg v. West Virginia Coal Ass'n*, 248 F.3d 275, 288 (4th Cir. 2001); *see* 30 U.S.C.A. § 1202. To accept this offer, "a State must pass a law that provides for the minimum national standards established as requirements in SMCRA and must also demonstrate that it has the capability of enforcing its law." *Id.* (citing 30 U.S.C.A. § 1253(a)); *see also* 30 C.F.R. § 732.15 (2006). SMCRA charges the Secretary of the Interior, acting through the Office of Surface Mining Reclamation and Enforcement ("OSM"), with the task of reviewing and either approving or disapproving state regulatory programs for the control of surface coal mining. 30 U.S.C.A. § 1211(c)(1).

Once the Secretary approves a state program, the State has achieved "primacy" and has exclusive jurisdiction to regulate surface coal mining within its borders. The federal requirements "drop out" as operative provisions, although they "continu[e] to provide the 'blueprint' against which to evaluate the State's program" and can be reengaged in a 30 U.S.C.A. § 1271 enforcement proceeding by the Secretary. *Bragg*, 248 F.3d at 289. Also, any proposed change to the laws or regulations that make up an approved State program must be submitted to the Secretary as a State program amendment, and the State lacks the authority to implement the change until the Secretary approves it. 30 C.F.R. § 732.17(g). The Secretary may not approve a State program amendment without first soliciting and publically disclosing the views of the public and relevant federal agencies and obtaining written concurrence of the Administrator of the Environmental Protection Agency ("EPA") with respect to aspects of the amendment(s) related to air or water quality standards. 30 C.F.R. § 732.17(h). Review of a State program amendment utilizes the same criteria applicable to the approval or disapproval of a State program in the first instance. 30 C.F.R. § 732.17(h)(10). Consequently, the Secretary must find the altered State program no less stringent than SMCRA and no less effective than the federal regulations in meeting

SMCRA's requirements in order to approve it. 30 C.F.R. §§ 730.5, 732.15(a).

B.

In January 1981, West Virginia received primacy in the form of a conditional approval pending correction of a number of deficiencies in its program. Inadequacies remained until 1988, when the State initiated an emergency rulemaking session to forestall federal takeover of all or part of its program. The 1988 emergency rules added regulatory definitions of "cumulative impact"[2] and "cumulative impact area."[3] (J.A. at 122-23.) The cumulative impact provision referenced circumstances in which material damage could occur, explaining that "[w]hen the magnitude of cumulative impact exceeds threshold limits

---

[2]The State defined "cumulative impact" as

the hydrologic impact that results from the cumulation of flows from all coal mining sites to common channels or aquifers in a cumulative impact area. Individual mines within a given cumulative impact area may be in full compliance with effluent standards and all other regulatory requirements, but as a result of the comingling of their off-site flows, there is a cumulative impact. The Act does not prohibit cumulative impacts but does emphasize that they be minimized. . . .

(J.A. at 122-23.)

[3]The State defined "cumulative impact area" as

the area within which impacts on surface and groundwater systems resulting from the proposed operation may interact with the impacts of all existing or anticipated mining throughout the lives of:

(a)   the proposed operation;

(b)   all existing operations;

(c)   any operation for which a permit application has been submitted to the Commissioner; and

(d)   all operations required to meet diligent development requirements for leased Federal coal for which there is actual mine development information available.

(J.A. at 123.)

or ranges as predetermined by the [West Virginia] Department [of Energy], they constitute material damage."[4] (J.A. at 123.) The Secretary approved the amendments in a final rule which noted that "[a]lthough the Federal regulations do not specifically define cumulative impact, the Federal requirements at 30 C.F.R. §§ 780.21(g) and 784.14(f) contain provisions regarding the cumulative impact of mining on the hydrologic balance which form the basis for the State's definition." *See* West Virginia; Permanent Regulatory Program, 55 Fed. Reg. 21,304, 21,308 (May 23, 1990).

On May 2, 2001, West Virginia submitted a state program amendment to OSM that deleted the cumulative impact definition and added a provision defining material damage as "any long term or permanent change in the hydrologic balance caused by surface mining operation(s) which has a significant adverse impact on the capability of the affected water resource(s) to support existing conditions and uses." *See* 66 Fed. Reg. 28,682, 28,683 (May 24, 2001). The proposed material damage definition left "significant adverse impact" undefined and lacked any indication of how the regulatory authority proposed to measure such an impact or determine when it would occur.

OSM responded by filing a notice of the proposed rule and opportunity for public comment in the Federal Register on May 21, 2004. The agency received comments from interested parties and other federal agencies. The United States Fish and Wildlife Service ("USFWS") recommended that OSM deny the proposed changes. The agency's opposition to the deletion of the cumulative impact provision stemmed from its ongoing concern for the potential of cumulative impacts from individual mountaintop mining operations to impair the ecological functioning of entire watersheds and the resulting belief that the law should "address this very important issue more thoroughly rather than with less scrutiny." (J.A. at 162-63). It considered the material damage definition inadequate because it left the terms "long term" and "significant adverse impact" undefined and therefore open to individual interpretation and because it effectively eliminated the consideration of short-term impacts without regard for

---

[4]In April 2001, the West Virginia Department of Environmental Protection became the regulatory authority for surface coal mining in West Virginia. *See* 30 C.F.R. § 948.10 (2006).

their magnitude. (J.A. at 162-63.) EPA also expressed concern and recommended that the cumulative impact definition not be deleted and the material damage definition be expanded to include "violation of water quality standards." (J.A. at 182.) Despite its concerns, EPA did grant its concurrence of the proposed amendment, with the understanding that its implementation must comply with the Clean Water Act (CWA) and its implementing regulations. OSM then requested additional clarification from West Virginia addressing the agencies' concerns, which the State provided. Upon receipt of the State's clarification letter, EPA reaffirmed its concurrence with the proposed amendment. The Secretary reopened the comment period to provide the public an opportunity to review and comment on the State's clarification. West Virginia Regulatory Program, 68 Fed. Reg. 44,910 (July 31, 2003). The Secretary issued a final rule on December 1, 2003, approving the amendments to West Virginia's program. West Virginia Regulatory Program, 68 Fed. Reg. 67,035, 67,043 (December 1, 2003) (to be codified at 30 C.F.R. pt. 948).

## C.

OVEC filed a complaint challenging the final rule in the United States District Court for the Southern District of West Virginia on January 30, 2004. *See* 30 U.S.C.A. § 1276(a)(1) ("Any action of the Secretary to approve or disapprove a State program . . . shall be subject to judicial review by the United States District Court for the District which includes the capital of the State whose program is at issue.") The complaint alleged that the Secretary's approval of the amendments violated the APA and SMCRA and sought declaratory and injunctive relief. On September 30, 2005, the district court granted summary judgment in favor of OVEC, vacating the Secretary's approval of the amendments and remanding the matter for further proceedings. OVEC next requested that the court amend the judgment because the Secretary had responded to the Order by sending the State a notice that treated the deletion of the cumulative impact definition as effective but in need of correction. On November 22, 2005, the district court issued an Amended Judgment Order directing the Secretary to instruct West Virginia that because the Secretary's approval had been vacated, the state had no authority to implement either amendment and therefore had to enforce the program as approved by OSM prior to the amendments. The Secretary

timely appealed both Orders. We have jurisdiction to hear this appeal pursuant to 28 U.S.C.A. § 1291 (West 2006).

## II.

We review de novo the district court's grant of summary judgment, applying the same standards that the district court was required to apply. *See Laber v. Harvey*, 438 F.3d 404, 415 (4th Cir. 2006) (en banc). Because the material facts of this case are not in dispute, summary judgment is appropriate. SMCRA requires a district court reviewing the Secretary's action of approving a state program to determine if the action "is arbitrary, capricious, or otherwise inconsistent with law." 30 U.S.C.A. § 1276(a)(1). This standard is consistent with the APA's requirement that an agency's action be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.A. § 706(2)(A).

The Secretary argues (1) that the APA's provisions for judicial review and procedural requirements do not apply if they overlap with those of another statute, (2) that approval of amendments to a state regulatory program pursuant to SMCRA § 1211(c) does not constitute rulemaking within the scope of APA § 553, and (3) that the OSM offered an explanation for the decision that comports with all requirements. We address each argument in turn.

## A.

The Secretary contends that the district court erred in applying APA standards. The Secretary argues that because SMCRA provides procedures and a standard of review that govern the approval or denial of state program amendments, its provisions represent the sole and exclusive check on OSM's discretion in that area, and the APA therefore does not apply. Because the novel approach urged by the Secretary misrepresents the place of the APA in this complex regulatory scheme, we decline to embrace it.

## 1.

We first address the Secretary's argument that the APA's provi-

sions for judicial review apply only to agency actions which have not been made reviewable by any other statute. This interpretation conflicts with the plain language of the APA, which subjects both "*[a]gency action made reviewable by statute* and final agency action for which there is no other adequate remedy in a court" to judicial review under the APA. 5 U.S.C.A. § 704 (emphasis added); *see also Abbott Lab. v. Gardner*, 387 U.S. 136, 139-41 (1967) (quoting § 704 and noting that Congress intended the APA's "'generous review provisions'" to "cover a broad spectrum of administrative actions"), *overruled on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977).[5]

To be sure, § 704's broad coverage does contain an exception for actions over which statutes expressly preclude judicial review. 5 U.S.C.A. § 701(a)(1). This exception is narrow, however, and "[c]ourts will decline to review agency actions only upon a showing that Congress clearly intended to restrict access to judicial review." *Hanauer v. Reich*, 82 F.3d 1304, 1307 (4th Cir. 1996); *see also Lindahl v. Office of Pers. Mgmt.*, 470 U.S. 768, 778 (1985). SMCRA evidences no such intent. To the contrary, Congress explicitly disclaimed any intent to supercede or preempt statutes with potentially overlap-

---

[5]We note that the D.C. Circuit has consistently applied APA standards to rulemaking actions undertaken pursuant to SMCRA. *See, e.g.*, *In re Surface Mining Regulation Litig.*, 627 F.2d 1346 (D.C. Cir. 1980); *Nat. Wildlife Fed. v. Hodel*, 839 F.2d 694 (D.C. Cir. 1988). In contrast, the authority on which the Secretary attempts to rely does not support her position. *Bennett v. Spear*, 520 U.S. 154 (1997), evidences no intent to excise a portion of § 704. *See id.* at 161-62 (observing that "the APA . . . *independently* authorizes review only when 'there is no other adequate remedy in a court'" (emphasis added) (quoting 5 U.S.C.A. § 704)). *Bowen v. Massachusetts*, 487 U.S. 879 (1988), addressed the application of APA § 704 to special statutory procedures for review established by specific agencies *prior* to the APA's enactment. Although the Court concluded that the APA's general provision for review was not intended to duplicate those special procedures, it cautioned that "[t]he exception that was intended to avoid such duplication should not be construed to defeat the central purpose of providing a broad spectrum of judicial review of agency action." *Id.* at 903. The Court therefore rejected the argument that the ability to seek monetary relief in the Court of Federal Claims under the Tucker Act barred APA review, describing it as a "restrictive-and unprecedented-interpretation of § 704." *Id.* at 904.

ping provisions. *See* 30 U.S.C.A. § 1292(a) ("Nothing in this chapter shall be construed as superseding, amending, modifying, or repealing . . . any of the following Acts or with any rule or regulation promulgated thereunder, *including, but not limited to* [a list of mining and environmental laws]." (emphasis added)).

2.

The Secretary argues that SMCRA impliedly preempts the APA requirement to publish a written statement explaining the findings that lead to the approval of a state program. We disagree. Although enabling acts may prescribe specific procedures, they rarely provide complete coverage. Instead, "in most administrative programs, the general APA and the specific enabling act work in concert to provide procedures and judicial review." 32 Charles Alan Wright & Charles H. Koch, *Federal Practice and Procedure* 8133 (2006). As a result, "[d]etermining the required procedures coordinates the general prescriptions of [the] APA with the specific requirements of the specific act." *Id.*

The Secretary's assertion that SMCRA, by specifically requiring written notice to the State if and only if any of its proposed program is denied,[6] implicitly makes any explanation of the decision to approve a state program unnecessary is unsupported. First, the obligation to provide detailed notice to the State, enumerating the problems that lead to the disapproval of all or part of its program, in no way conflicts with the APA requirement that the Secretary publish a rule incorporating a statement of basis and purpose in the Federal Register. A State whose proposed program has been rejected may resubmit a revised version within sixty days, and this particularized notice serves to assist the State in that regard. *See* 30 C.F.R. § 732.17(h)(8). Second, SMCRA's implementing regulations specifically provide that "[a]ll decisions *approving or not approving program amendments* must be published in the Federal Register . . . ." 30 C.F.R. § 732.17(h)(12) (emphasis added). This provision is consistent with the APA's notice and comment rulemaking procedures.

---

[6]*See* 30 U.S.C.A. § 1253(c) ("If the Secretary disapproves any proposed state program in whole or in part, he shall notify the State in writing of his decision and set forth a detailed reason therefor.").

### B.

We next briefly address the Secretary's argument that the approval of state program amendments does not constitute rulemaking for purposes of judicial review because it does not involve the promulgation of national rules and regulations. The APA defines a "rule" as

> the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing

5 U.S.C.A. § 551(4). It defines "rulemaking" as the "agency process for formulating, amending, or repealing a rule." 5 U.S.C.A. § 551(5). This broad language compels the conclusion that rulemaking within the meaning of 5 U.S.C.A. § 553 is not limited to the promulgation of national standards. *See also* 30 U.S.C.A. § 1276(a)(1) (judicial review provision referencing "action of the Secretary to approve or disapprove a State program," "action by the Secretary promulgating national rules or regulations," and "other action constituting rulemaking").

Moreover, we note that the Secretary's argument on appeal directly contradicts OSM's characterization of the action throughout the administrative process. An agency engaged in rulemaking pursuant to APA § 553 must "follow[ ] a three-step process — issuance of a notice of proposed rulemaking, followed by receipt and consideration of comments on the proposal, followed by promulgation of a final rule that incorporates a statement of basis and purpose." Kenneth Culp Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 7.4 (3d ed. 1994). Here, the agency issued a notice of proposed rulemaking, received and considered comments, promulgated a final rule incorporating a statement of basis and purpose, and then, after the explanation contained therein was challenged as inadequate, argued that the process did not apply. *See* West Virginia Regulatory Program,

68 Fed. Reg. 67035-67045 (finding "good cause . . . under 5 U.S.C. § 553(d)(3) to make this final rule effective immediately"); West Virginia Regulatory Program, 68 Fed. Reg. at 44,910-44,913; West Virginia Regulatory Program, 66 Fed. Reg. at 28,682-28,685. It is therefore clear that the Secretary was engaged in rulemaking pursuant to 5 U.S.C. § 553.

## C.

Having determined that the district court did not err in applying APA standards, we turn to the question of whether the Secretary's approval of the amendments was arbitrary and capricious. *See* 5 U.S.C.A. § 706(a)(2)(A); 30 U.S.C.A. § 1276(a)(1). The arbitrary-and-capricious standard directs the reviewing court to determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989) (internal quotation marks omitted). As the Supreme Court has explained,

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Although the scope of review is narrow, the agency must nevertheless "explain the evidence which is available, and must offer a rational connection between the facts found and the choice made." *Id.* at 43, 52 (internal quotation marks omitted).

The Secretary does not personally approve state program amendments, but rather acts through the Director of OSM. In this case, the findings accompanying OSM's approval of the proposed amendments indicate that the agency based the decision to approve the deletion of the "cumulative impact" definition exclusively on the absence of a corresponding definition in the federal regulations, ignoring any

actual effect that the change might have on West Virginia's program. West Virginia Regulatory Program, 68 Fed. Reg. at 67036 ("We express no further opinion on whether or how the deletion of this definition may alter the current CHIA process in West Virginia, because such procedural changes are within the State's discretion under the existing Federal regulations."). OSM recognized that this approach was "different than the question of whether the deletion of the definition of 'cumulative impact' may alter the existing CHIA process in West Virginia in a way that is adverse to some commenters' interests." *Id.* The "interests" to which that statement refers are presumably the environmental protection concerns asserted by OVEC, USFWS, and to some extent, EPA. Thus, OSM acknowledged that the change may have weakened the program, but did not explain why an amendment with the potential to alter the CHIA process in a way that may make it less environmentally protective is nevertheless consistent with SMCRA's minimum requirements. Instead, it avoided the question. In doing so, it failed to provide a reasoned explanation based on the evidence before the agency and ignored an important aspect of the problem. *See State Farm*, 463 U.S. at 43; *NAACP, Jefferson County Branch v. Donovan*, 765 F.2d 1178, 1179 (D.C. Cir. 1985) (invalidating a Department of Labor regulation for failure to consider an important aspect of the problem and provide a reasoned explanation). SMCRA requires OSM to find not only that the amended program contains counterparts to all federal regulations, but also that it is no less stringent than SMCRA and no less effective than the federal regulations in meeting SMCRA's requirements.

OSM used an identical justification in approving the "material damage" definition, asserting that "there is no Federal requirement that States must develop a specific definition of material damage," and as a result, "the proposed definition does not *on its face* negate, supercede, alter, or conflict with any of the approved State rules related to the CHIA process or their federal counterparts," making it no less stringent than Federal regulations. West Virginia Regulatory Program, 68 Fed. Reg. at 67036-37 (emphasis added). In doing so, the agency essentially declined to analyze or review the definition at all. Instead, it found that in the absence of a federal definition, any state definition would warrant approval so long as it did not facially negate a federal requirement. The APA procedures, however, are designed to avoid that kind of rubber-stamp, and require more of the agency. The

added definition made West Virginia's proposed program different than the nationwide program. OSM's obligation is to analyze that different feature and explain whether and why the added provision renders the amended state program more, less, or equally effective compared to the federal requirements. At a minimum, it must address the potential effect of the amendment on the state program and provide a reasoned analysis of its decision to approve it.

### III.

In sum, we conclude that the Secretary was required to comply with the APA's § 553 rulemaking procedures, and the district court did not err in applying APA standards. We also conclude that the Secretary's failure to analyze and explain the decision to approve West Virginia's state program amendment rendered the action arbitrary and capricious. We therefore affirm the judgment of the district court.

*AFFIRMED*