WEST VIRGINIA HIGHLANDS CONSERVANCY, INC. and West Virginia Rivers Coalition, Inc., Plaintiffs,

v.

Randy C. HUFFMAN, Secretary, West Virginia Department of Environmental Protection, Defendant.

Civil Action No. 2:07–0410.

United States District Court, S.D. West Virginia, at Charleston.

Aug. 24, 2009.

Derek O. Teaney, Joseph Mark Lovett, Appalachian Center for the Economy and the Environment, Lewisburg, WV, James M. Hecker, Trial Lawyers for Public Justice, Washington, DC, for Plaintiffs.

Heather A. Connolly, West Virginia Department of Environmental Protection, Charleton, WV, for Defendant.

### *MEMORANDUM OPINION AND ORDER*

JOHN T. COPENHAVER, JR., District Judge.

Pending is the motion of the plaintiffs for summary judgment and declaratory and injunctive relief, filed March 12, 2008. For the reasons that follow, the motion is granted.

### I.

Surface coal mining operations in West Virginia can be said to fall in one of three

categories: (1) abandoned mine lands which completed operations prior to the passage of the Surface Mining Control and Reclamation Act of 1977 ("SMCRA"), 30 U.S.C. §§ 1201 through 1328; (2) active or completed operations, which were started or bond released since SMCRA's passage; and (3) bond forfeiture sites, where the permits of the mining companies have been revoked and bonds forfeited by the West Virginia Department of Environmental Protection ("WVDEP"). (WV AMD Study at 1, attached as Ex. 1 to M.S.J.). This case is a citizen suit brought under the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 through 1387, concerned with the discharge of acid mine drainage ("AMD") at sites in the third category, bond forfeitures. (Mem. in Supp. of M.S.J. at 2).

First to be determined here is whether the WVDEP is acting in contravention of the CWA by discharging pollutants without the appropriate permit. If the WVDEP is indeed in violation of the CWA, it must next be determined whether the Eleventh Amendment bars this action against defendant Randy C. Huffman, Secretary of the WVDEP ("Secretary"). If the former query is answered in the affirmative, and the latter in the negative, plaintiffs are entitled to judgment in their favor.

## II.

The WVDEP revoked one surface mining permit of Harvey Energy Corp. in Fayette County, three surface mining permits of Royal Scott Minerals Inc. in Greenbrier County, and five surface mining permits of Triple A Coals, Inc. in Nicholas County and it forfeited the bonds posted by the three mine operators for those sites, all of which are located in the Southern District of West Virginia.[1] (Stip. ¶ 1 and Table A, attached as Ex. 4 to M.S.J.). The WVDEP, as the operator of the treatment systems for the bond forfeiture sites, treats discharges of water at each of those sites and monitors for "pollutants," as defined in 33 U.S.C. § 1362(6). (*Id.* ¶¶ 2, 5).

Prior to the bond forfeitures, WVDEP issued a West Virginia National Pollutant Discharge Elimination System ("WV/NPDES") permit under the CWA, 33 U.S.C. § 1342, to the three mine operators for discharges at each site. (*Id.* ¶ 6). The WVDEP, however, does not currently have a WV/NPDES permit for discharges at any of the sites. (*Id.* ¶ 7).

The WVDEP has issued hundreds of NPDES permits for discharges from active mining sites. (WV AMD Study at 2, attached as Ex. 1 to M.S.J.). Only one NPDES permit, however, has been issued by the WVDEP to itself for discharges from a bond forfeiture site. That site was formerly controlled by the DLM Coal Co., and the permit was issued as a consequence of litigation. (WV/NPDES Permit No. WV0042056, attached as Ex. 2 to M.S.J.; Ellison Depo. at 113–114, attached as Ex. 3 to M.S.J.).

---

1. A parallel action styled *West Virginia Highlands Conservancy, Inc. and West Virginia Rivers Coalition v. Randy Huffman, Secretary, West Virginia Department of Environmental Protection*, Civil Action No. 07–cv–87, was filed in the Northern District of West Virginia on June 29, 2007. The action involves eighteen bond forfeiture sites located in the Northern District of West Virginia that are similarly alleged to be in violation of the CWA. By order dated January 14, 2009, the court granted plaintiffs' motion for summary judgment, declared the WVDEP to be in violation of the CWA and ordered the WVDEP to apply for and obtain permits for all sites in issue. *See West Virginia Highlands Conservancy, Inc., et al. v. Huffman*, 588 F.Supp.2d 678 (N.D.W.Va.2009). On March 26, 2009, final judgment was entered in the case.

■ The WVDEP's obtainment of a permit has important consequences. "Generally speaking, the NPDES requires dischargers to obtain permits that place limits on the type and quantity of pollutants that can be released into the Nation's waters." *Piney Run Preservation Ass'n v. County Commissioners of Carroll County, Maryland,* 523 F.3d 453, 456 (4th Cir. 2008) (*"Piney Run II"*) (quoting *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians,* 541 U.S. 95, 102, 124 S.Ct. 1537, 158 L.Ed.2d 264 (2004)). "An NPDES permit 'defines, and facilitates compliance with, and enforcement of, a preponderance of a discharger's obligations under the' [CWA]." *Id.* (quoting *EPA v. California ex rel. State Water Res. Control Bd.,* 426 U.S. 200, 205, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976)). Importantly here, limits set forth in an NPDES permit must be based on the best practicable pollution control technology, plus any limitations needed to meet state water quality standards. *See* 33 U.S.C. § 1311(b)(1)(A) and (C); 40 C.F.R. § 122.44(a)(1) and (d)(1). Explaining the difference between the standards, the Supreme Court stated:

> the Act provides for two sets of water quality measures. "Effluent limitations" are promulgated by the EPA ["Environmental Protection Agency"] and restrict the quantities, rates, and concentrations of specified substances which are discharged from point sources. *See* §§ 1311, 1314. "[W]ater quality standards" are, in general, promulgated by the States and establish the desired condition of a waterway. *See* § 1313. These standards supplement effluent limitations "so that numerous point sources, despite individual compliance with effluent limitations, may be further regulated to prevent water quality from

falling below acceptable levels." *EPA v. California ex rel. State Water Resources Control Bd.,* 426 U.S. 200, 205, n. 12, 96 S.Ct. 2022, 2025, n. 12, 48 L.Ed.2d 578 (1976).

*Arkansas v. Oklahoma,* 503 U.S. 91, 101, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992). Ken Ellison ("Ellison"), the designated WVDEP representative and Director of the Division of Land Restoration of the WVDEP, has indicated the WVDEP's position to be that it did "not take on the permittee's compliance duties." (Ellison Depo. at 48, attached as Ex. 3 to M.S.J.). Currently, WVDEP is only treating discharges from the three sites to technology-based standards, not the more stringent water-quality based standards. (*Id.* at 28–32, 51–52; Mem. in Supp. M.S.J. at 4).

### III.

Plaintiffs' claim is that of a CWA citizen bringing suit pursuant to 33 U.S.C. § 1365 for violation of 33 U.S.C. § 1311(a), which prohibits the discharge of pollutants in a manner that is inconsistent with 33 U.S.C. § 1342, or, in other words, without a NPDES permit.[2] (Compl.¶¶ 10–11). The plaintiffs' motion for summary judgment requests that the court declare the Secretary to be in violation of the CWA and order him to apply for and obtain WV/NPDES permits within six months of the date of this order, provide monthly status reports to plaintiffs until the permits are obtained, and notify plaintiffs and the court when the permits are obtained. (M.S.J.). Plaintiffs also seek an award of costs and fees. (Compl. at 5).

On May 16, 2008, plaintiffs and the Secretary filed a joint motion to amend the scheduling order in which they stated that,

---

**2.** "State court review is unavailable as the West Virginia Water Pollution Control Act—the state version of the federal CWA—does not have a citizen suit provision. W. Va.Code § 22–11–1 *et seq.*" *Ohio Valley Environmental Coalition, Inc. v. Apogee Coal Co., LLC,* 531 F.Supp.2d 747, 755 (S.D.W.Va.2008).

"[t]he parties agree that there are no contested fact issues to be tried in this case, and that the contested legal issues may be decided on the briefs, stipulation, and exhibits filed by the parties concerning Plaintiffs' pending motion for summary judgment." (Jt. Mot. to Am. Sched. Order at 1). Earlier, however, in his April 14, 2008 response to the pending motion for summary judgment, the Secretary stated that there were genuine issues of material fact. (Resp. to M.S.J. at 5). The Secretary did not, however, cite any issues of fact specifically and attached only one exhibit to his response which did not create a factual dispute. Instead, the Secretary's response focused entirely on issues of law. Accordingly, the court accepts the joint assertion of the parties that there are no contested issues of fact. A party is, of course, entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

## IV.

"Congress enacted the CWA 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.' " *Piney Run II,* 523 F.3d at 455 (quoting 33 U.S.C. § 1251). The CWA contains a general prohibition on the "discharge of any pollutant," except in compliance with a state or federal version of the NPDES permit program. 33 U.S.C. §§ 1311(a), 1342; *Piney Run II,* 523 F.3d

at 455 (quoting *Miccosukee Tribe,* 541 U.S. at 102, 124 S.Ct. 1537); *Kentuckians for Commonwealth Inc. v. Rivenburgh,* 317 F.3d 425, 447 (4th Cir.2003). It is well recognized that "[t]he centerpiece of the CWA is the NPDES permitting program." *Am. Iron & Steel Inst. v. EPA,* 115 F.3d 979, 990 (D.C.Cir.1997); *Dubois v. United States Dep't of Agric.,* 102 F.3d 1273, 1294 (1st Cir.1996) ("The most important component of the . . . [CWA] is the requirement that an NPDES permit be obtained."). Section 402 of the CWA, "establishes the NPDES permitting regime, and describes two types of permitting systems: state permit programs that must satisfy federal requirements and be approved by the EPA, and a federal program administered by the EPA." *Arkansas,* 503 U.S. at 102, 112 S.Ct. 1046; *see* 33 U.S.C. § 1342. The EPA granted West Virginia the authority to administer its own NPDES program, and permits in West Virginia are issued by the WVDEP. *Ohio Valley Environmental Coalition, Inc. v. Apogee Coal Co., LLC,* 531 F.Supp.2d 747, 753 (S.D.W.Va.2008) (citing W. Va.Code § 22–11–4(a)(1); 47 C.S.R. § 10–3 (2005)).

The CWA citizen suit provision affords "any citizen" the right to "commence a civil action on his own behalf—(1) against any person (including (i) the United States and (ii) any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter. . . ." [3] 33 U.S.C. § 1365.

---

**3.** In a recent decision, our court of appeals explained that the citizen suit provision is a "second level of enforcement" meant to supplement the "primary responsibility" vested in the state and federal governments. *Piney Run II,* 523 F.3d at 456 (internal citations omitted). Citizen suits "serve as a check to ensure the state and federal governments are diligent in prosecuting Clean Water Act violations." *Id.* The court noted that the "citizen suit provision is 'critical' to the enforcement of the CWA . . . as it allows citizens 'to abate pollution when the government cannot or will not command compliance. . . .' " *Id.* (internal citations omitted).

Under this statutory framework, courts have found citizens to possess a cause of action under § 1365 to stop the discharge of pollutants without a permit. *See, e.g., U.S. Pub. Interest Research Group v. Atl. Salmon of Me., LLC,* 339 F.3d 23, 27 (1st Cir.2003); *Association to Protect Hammersley, Eld and Totten Inlets v. Taylor Resources, Inc.,* 299 F.3d 1007, 1012 (9th Cir.2002); *Sierra Club v. Cedar Point Oil,* 73 F.3d 546, 561 (5th Cir.1996). A state "has no authority to create a permit exemption from the CWA for discharges that would otherwise be subject to the NPDES permitting process." *Northern Plains Resource Council v. Fidelity Exploration and Development Co.,* 325 F.3d 1155, 1164 (9th Cir.2003) (citing 33 U.S.C. § 1370).

To establish liability for a violation of the CWA NPDES permit requirement, plaintiffs must show that the Secretary (1) discharged or added (2) a pollutant (3) to waters of the United States (4) from a point source (5) without a permit.[4] *See* 33 U.S.C. §§ 1311(a), 1342, 1362(12); *Committee to Save the Mokelumne River v. East Bay Municipal Utility Dist.,* 13 F.3d 305, 308 (9th Cir.1993), *cert. denied* 513 U.S. 873, 115 S.Ct. 198, 130 L.Ed.2d 130 (1994); *National Wildlife Fed'n v. Gorsuch,* 693 F.2d 156, 165 (D.C.Cir.1982).

The stipulation of the parties, attached to the motion for summary judgment, provides, in relevant part, as follows:

2. At each of the sites ... WVDEP has operated, and is continuing to operate, a treatment system to treat discharges of water from the site.

3. At each of the sites ... the water from the treatment system is discharged from the outfall(s)....

4. At each of the sites ... the water discharged from the discharge points enters the receiving stream ... which is a part of the larger river watershed.... Each of these receiving streams is a water of the United States as defined at 33 U.S.C. § 1362(7).

5. At each of the sites ..., the water discharged from the discharge points has been monitored by WVDEP for pollutants ... as defined at 33 U.S.C. § 1362(6).

6. Prior to bond forfeiture, WVDEP issued a WV/NPDES permit under the Clean Water Act, 33 U.S.C. § 1342, to the mine operator for discharges of water from each of the sites and discharge points ....

7. WVDEP does not have a WV/NPDES permit for discharges from any of the [relevant] sites and discharge points....

(Stip. ¶¶ 2–7, attached as Ex. 4 to M.S.J.). With this stipulation, the third element, "waters of the United States," (*id.* ¶ 4), and fifth element, "without a permit," (*id.* ¶ 7), are plainly satisfied.

The Secretary's response to the plaintiffs' motion for summary judgment "admits [that the] WVDEP manages and controls the release of AMD [acid mine drainage] on these sites." (Resp. to M.S.J. at 9). Inasmuch as AMD is obviously a pollutant under the definition of "pollution" in 33 U.S.C. § 1362(19), *see, e.g., Mokelumne,* 13 F.3d at 308, the second element is fulfilled. Further, making it abundantly clear that the second element, "pollutant," has been satisfied, Ellison testified, in reference to the sites at issue, that the WVDEP "treat[s] pollutional discharges. We are going there to treat an existing pollution problem." (El-

---

4. Plaintiffs spend considerable time in their memorandum explaining how they have satisfied the requirements for standing. The Secretary makes no argument or reference to standing in his response. Having reviewed the plaintiffs' memorandum and exhibits attached to the motion, the standing requirements are satisfied.

lison Depo. at 50, attached as Ex. 3 to M.S.J.).

With respect to the first element, "discharged or added," the court reiterates the Secretary's admission that AMD is being released at the sites. (Resp. to M.S.J. at 9). It is thus indisputable that discharge of pollutants is occurring. The question of causation that remains with respect to this element is whether the discharge is "by" the WVDEP, as required by § 1311(a).

■ It is generally recognized that liability under the CWA is a form of strict liability. *Stoddard v. Western Carolina Regional Sewer Auth.*, 784 F.2d 1200, 1208 (4th Cir.1986) (citing *United States v. Earth Sciences, Inc.*, 599 F.2d 368 (10th Cir.1979); *United States v. Amoco Oil Co.*, 580 F.Supp. 1042 (W.D.Mo.1984)); *accord American Canoe Ass'n v. Murphy Farms*, 412 F.3d 536, 540 (4th Cir.2005) (citing *Stoddard* ). "The regulatory provisions of the FWPCA [Federal Water Pollution Control Act, a 1972 amendment to the CWA] were written without regard to intentionality, ... making the person responsible for the discharge of any pollutant strictly liable." *U.S. v. Earth Sciences, Inc.*, 599 F.2d 368, 374 (10th Cir. 1979). "Nothing in the Act relieves" defendants "from liability simply because the operators did not actually construct those conveyances, so long as they are reasonably likely to be the means by which pollutants are ultimately deposited into a navigable body of water." *Sierra Club v. Abston Const. Co., Inc.*, 620 F.2d 41, 45 (5th Cir.1980).

■ The Secretary argues that the WVDEP is not the owner of the property upon which the sites are located and has not reaped any benefit from its use thereof, and thus does not stand in the shoes of the former permittees. (Resp. to M.S.J. at 5, 9). In his deposition, Ellison confirmed what the Secretary later said in his response—that the WVDEP controls the discharge of AMD at the sites. (*Id.* at 9; Ellison Depo. at 49, attached as Ex. 3 to M.S.J.). The stipulation indicates that the WVDEP operates the treatment system of discharges of water at the sites. (Stip. ¶ 2, attached as Ex. 4 to M.S.J.).

"The causation requirement can be met because of a defendant's control over discharges." *Comm. to Save the Mokelumne River v. East Bay Mun. Util. Dist.*, 37 Env't Rep. Cas. (BNA) 1159, 1170 (E.D.Cal.1993) (citing *Friends of the Sakonnet v. Dutra*, 738 F.Supp. 623, (D.R.I. 1990), *aff'd* 13 F.3d 305 (9th Cir.1993)). As the Secretary admittedly exercises control over the bond forfeiture sites, and is now responsible for the discharges occurring there, the causation requirement is met. (Resp. to M.S.J. at 9). Accordingly, the first element, "discharged or added," is satisfied.[5] *See Murphy Farms III*, 412 F.3d at 540; *Stoddard*, 784 F.2d at 1208; *Abston*, 620 F.2d at 45; *Earth Sciences*, 599 F.2d at 374.

■ The fourth element, "from a point source," requires a return to the text of the CWA. A "point source" is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, [or] discrete fissure ... from which pollutants are or may be discharged." *See* 33 U.S.C. § 1362(14). The EPA has stated its intent "to embrace the broadest

---

5. Further support for this position is found in the federal and state rules that require the operator, rather than the owner of the property, to obtain the NPDES permit. 40 CFR § 122.21(b) ("When a facility or activity is owned by one person but is operated by another, it is the operator's duty to obtain a permit."); 47 CSR § 10–4.1.b ("When a facility or activity is owned by one (1) person but is operated by another, the application should be submitted by the operator.").

possible definition of point source consistent with the legislative intent of the CWA." *See* 55 Fed. Reg. 47990, 47997 (Nov. 16, 1990). The WVDEP has stipulated that the water from the treatment system is discharged through outfalls. (Stip. ¶ 3, attached as Ex. 4 to M.S.J.). Ellison admitted that each outfall has the physical characteristics of a point source. (Ellison Depo. at 23, attached as Ex. 3 to M.S.J.). The WVDEP's photographs show that each outfall is a pipe, which is expressly mentioned in the non-exhaustive list in the definition of a point source. (*Id.* at 63–67; Discharge Point Photographs, attached as Exs. 12–13 to M.S.J.). Ellison further acknowledged that if the outfalls were operated by a private company, they would require a NPDES permit. (Ellison Depo. at 20, 23, attached as Ex. 3 to M.S.J.).

The Secretary argues that the EPA and the Office of Surface Mining of the Secretary of the Interior ("OSM") do not consider AMD at bond forfeiture sites to be from point sources. (Resp. to M.S.J. at 10–16). According to the Secretary, the EPA considers abandoned mine lands and bond forfeiture sites to be "unpermitted discharge sites . . . and categorized them accordingly" in its Total Maximum Daily Load ("TMDL") allocation, which the Secretary describes as a plan of action used to clean up streams not meeting water quality standards. (*Id.* at 10–11). The Secretary further argues that, for many years, the EPA has been aware of the WVDEP's position that bond forfeiture sites do not require a NPDES permit, and has tacitly approved of the State's level of water treatment under the TMDL approach. (*Id.* at 11–12). The approval of the EPA is also displayed, the Secretary asserts, in a 2001 correspondence from the Pennsylvania Department of Environmental Protection ("PADEP") advising the EPA of its plan to treat abandoned mine land and bond forfeiture sites in a comprehensive manner using the TMDL approach, rather than under the NPDES permitting regime. (*Id.* at 12; 08–20–01 PADEP Ltr. to EPA, attached as Ex. to Resp. to M.S.J.).

Plaintiffs point out, and the Secretary acknowledges, however, that the EPA has not determined that discharges from bond forfeiture sites are exempt from NPDES permitting requirements. (Reply to Resp. to M.S.J. at 9; Resp. to M.S.J. at 12). To underscore their point, plaintiffs quote the following excerpt from EPA's response to the PADEP:

> We also wish to call your attention to a statement in your letter which does not accurately characterize EPA's view. You indicated that it is EPA's view that "discharges of mine drainage from abandoned mine lands constitute non-point source pollution best handled using a TMDL-based approach." We acknowledge that some acid mine drainage TMDLs address abandoned and reclaimed mine lands as non-point sources for modeling purposes. This is because there are no current National Pollutant Discharge Elimination System (NPDES) permits associated with these areas. As such, the discharges associated with these land uses were assigned load allocations. In each instance, EPA has noted that the decision to assign load allocations to abandoned and reclaimed mine lands *does not reflect any determination by EPA as to whether there are unpermitted point source discharges within these land uses. Nor does it reflect a determination by EPA that these discharges are exempt from NPDES permitting requirements.*

(11–07–01 EPA Ltr. to PADEP, attached as Ex. to Resp. to M.S.J.) (emphasis added). The underlined portion of the response of the EPA nullifies the Secretary's argument that the EPA has decided that

discharges from bond forfeiture sites cannot be deemed to be from point sources.

The EPA is the federal agency responsible for administering portions of the CWA. *See* 33 U.S.C. § 1251, *et seq.* Under SMCRA, in certain circumstances the OSM is responsible for aspects of surface mining reclamation. *See* 30 U.S.C. § 1252, *et seq.* SMCRA mandates that the OSM have exclusive regulatory authority over the surface mining reclamation programs of states that have not passed adequate laws governing surface coal mining reclamation. *Id.* § 1254. Unlike West Virginia, in Tennessee the OSM has assumed such regulatory authority. *See* 72 Fed. Reg. 9616 (Mar. 2, 2007). It is of interest to observe how the OSM perceived its role in Tennessee. In the federal register the OSM indicated that, because in its regulatory capacity the OSM does "not assume the permittee's NPDES compliance duties," it did not intend to seek NPDES permits at bond forfeiture sites. *Id.* at 9629.

As plaintiffs point out, the OSM's statement in the federal register only considered the extent of its responsibility under SMCRA, and the rules implementing SMCRA. *Id.* OSM did not purport to address a state's authority or, for that matter, the EPA's authority under the CWA. Indeed, the OSM acknowledged, "[i]ssuance of a National Pollutant Discharge Elimination System (NPDES) permit for point-source discharges and establishment of effluent limits for those discharges is the responsibility of the agency charged with administering the CWA in Tennessee." *Id.* at 9627. The OSM's statements, therefore, do not constitute an agency interpretation that bond forfeiture sites are exempt from the NPDES permitting requirements of the CWA.

In the absence of a NPDES permit, "the discharge of any pollutant by any person shall be unlawful." § 1311(a); *see Citizens Coal Council v. EPA,* 447 F.3d 879, 919 (6th Cir.2006) (citing § 1311(a) and stating "nobody may pollute without a NPDES permit."); *Sierra Club v. El Paso Gold Mines, Inc.,* 421 F.3d 1133, 1142 (10th Cir.2005) ("Section 301(a) of the CWA states that 'the discharge of any pollutant by any person shall be unlawful,' unless authorized by an NPDES permit.") The CWA defines "person" as "an individual, corporation, partnership, association, *state,* municipality, commission or political subdivision of a state, or any interstate body." § 1362(5) (emphasis added). Thus, the text of the CWA supports plaintiffs' position that bond forfeiture sites operated by the state are subject to CWA permitting requirements.

■ While the EPA "does not have authority to exempt categories of point sources from the permit requirements of" the CWA, *Natural Resources Defense Council, Inc. v. Costle,* 568 F.2d 1369, 1377 (D.C.Cir.1977), the regulations established by the EPA to effectuate the NPDES permitting system provide further support for the plaintiffs' position. Under those regulations, "[a]ny person who discharges or proposes to discharge pollutants ... and who does not have an effective permit ... must submit a complete application to the Director in accordance with this section." 40 C.F.R. § 122.21(a). Similar to the text of the CWA, 40 C.F.R. § 122.2 defines "person" as "an individual, association, partnership, corporation, municipality, State or Federal agency, or an agent or employee thereof." Titled, "Who applies," 40 C.F.R. § 122.21(b) provides "[w]hen a facility or activity is owned by one person but is operated by another person, it is the operator's duty to obtain a permit." "Owner or operator means the owner or operator of any 'facility of activity' subject to regulation under the NPDES program."

40 C.F.R. § 122.2. Facility or activity "means any NPDES 'point source' or any other facility or activity (including land or appurtenances thereto) that is subject to regulation under the NPDES program." *Id.* As noted, the secretary admits that the WVDEP "manages and controls the release of AMD" at the sites in question. (Resp. to M.S.J. at 9). "When an operator applies for a NPDES permit, the following information must be provided: "operator's name, address, telephone number, ownership status, and status as Federal, State, private, public, or other entity." 40 C.F.R. § 122.21(f)(4).

■ The outfalls at issue here have the physical characteristics of a point source. (Ellison Depo. at 23, attached as Ex. 3 to M.S.J.). The Secretary's sole basis for denying that the outfalls are point sources is his contention that the EPA does not treat bond forfeiture sites that discharge AMD as point sources. (Resp. to M.S.J. at 10). As shown above, the EPA has not taken such a position. The text of the CWA clearly provides that, as a "person" under the Act, a state shall not discharge pollutants without a permit. The regulations promulgated in accordance with the CWA are in accord. Nothing in the text of the CWA, or the regulations, leads the court to believe that a "discernable, con-fined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well [or] discrete fissure … from which pollutants are or may be discharged," 33 U.S.C. § 1362(14), is not a point source simply because it is managed and controlled by the state. As noted by the court in *Piney Run Preservation Ass'n v. County Com'rs of Carroll County*, 268 F.3d 255, 265 (4th Cir.2001) ("*Piney Run I*"), "Congress intended the NPDES permit to be the only means by which a discharger from a point source may escape the total prohibition of § [1311(a) ]." The WVDEP is such a "discharger," and the plaintiffs have established the five elements of a successful claim under the CWA for the discharge of pollutants without an NPDES permit.[6]

## V.

### A.

■ The Eleventh Amendment "bars 'citizens from bringing suits in federal court against their own states.' " *Bragg v. West Virginia Coal Ass'n*, 248 F.3d 275, 291 (4th Cir.2001) (internal citations omitted).[7] The Amendment further acts as a bar where, as here, the suit is against a state official but the State is the real party in interest. *Id.* Eleventh Amendment im-

**6.** Another of the Secretary's arguments is that obtaining NPDES permits would be inconsistent with WVDEP's duties under state law to prioritize treatment methods based on a cost-benefit analysis, 38 CSR 12.5.c.-d., and impose treatment costs on the mine operator, 38 CSR 2–12.4.e. Inasmuch as (1) the state standards are not inconsistent with and are not a basis for violating federal law, irrespective of their inconsistency; (2) a state may not create an exception to the permit requirement, *see Northern Plains*, 325 F.3d at 1164; (3) West Virginia mining regulations require "that all applicable effluent and applicable water quality standards are met" at bond forfeiture sites, 38 CSR § 2–2.37; and (4) the Supreme Court of Appeals of West Virginia has held that W. Va.Code § 22–3–11(g) imposes on WVDEP "a mandatory, nondiscretionary duty to utilize moneys from the SRF [Special Reclamation Fund] … to treat AMD at bond forfeiture sites when the proceeds of the forfeited bonds are less than the actual cost of reclamation[,]" *State ex rel. West Virginia Highlands Conservancy v. WVDEP*, 191 W.Va. 719, 724, 447 S.E.2d 920, 925 (1994), the court rejects the Secretary's argument and finds a more detailed discussion to be unnecessary.

**7.** U.S. CONST. amend. XI provides: The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

munity is "an essential element of the constitutional design" inasmuch as it "accords the States the respect owed them as members of the federation" and "protects the States' ability to govern in accordance with the will of their citizens." *Id.* (internal citations omitted).

 As noted by our court of appeals, Eleventh Amendment immunity is not absolute: "A State's immunity to suit in federal court is subject to well established and important exceptions." *Id.* (citing *S.C. State Ports Auth. v. Fed. Maritime Comm'n,* 243 F.3d 165 (4th Cir.2001)) (enumerating six exceptions to Eleventh Amendment immunity). The exception at issue here is that private individuals or entities are not precluded from suing state officials for prospective injunctive or declaratory relief designed to remedy ongoing violations of federal law. *See Ex parte Young,* 209 U.S. 123, 157, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The rationale for the so-called *"Ex parte Young* exception" is the notion that when a state officer violates federal law, he is stripped of his official character, and thereby loses the cloak of state immunity. *See id.* at 159–60, 28 S.Ct. 441; *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 281, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997); *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 102, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Bragg,* 248 F.3d at 292.

Citing *Bragg,* the Secretary argues that he is immune from suit under the Eleventh Amendment. He says that "[b]ecause the State of West Virginia has an approved NPDES permitting program and is therefore the primary regulator with respect to the issuance of NPDES permits in West Virginia, this lawsuit is ultimately an at-tempt to force Secretary Huffman to comply with state laws and regulations relating to the issuance of an NPDES permit." (Resp. to M.S.J. at 6). In *Bragg,* which arose under SMCRA, an important issue was whether the violation in question was a matter of federal law, and thus fell under the *Ex parte Young* exception to Eleventh Amendment immunity, or whether the SMCRA violation implicated state law and was within the confines of Eleventh Amendment immunity under *Pennhurst,* 465 U.S. at 106, 104 S.Ct. 900. It is *Pennhurst* that held the *Ex parte Young* exception not to apply to state-law claims.[8] *See Bragg,* 248 F.3d at 289–295.

In *Bragg,* West Virginia state officials were sued under SMCRA, which allows states to enact their own surface mining reclamation laws and submit them to the Secretary of the Interior for review. *See Antrican v. Odom,* 290 F.3d 178, 187 (4th Cir.2002). Once the Secretary of the Interior approves a state mining reclamation program, the state has achieved "primacy" status in the SMCRA regime. *See Ohio River Valley Environmental Coalition, Inc. v. Kempthorne,* 473 F.3d 94, 97 (4th Cir.2006) (citing *Bragg,* 248 F.3d at 289).

Primacy status under SMCRA affords the state "exclusive jurisdiction to regulate surface coal mining within its borders." 30 U.S.C. §§ 1252(e), 1253(a); *Bragg,* 248 F.3d at 288–289. The "exclusive control over the regulation of surface mining," exists "so long as the State law fulfills minimum national standards." *Antrican,* 290 F.3d at 187 (citing *Bragg,* 248 F.3d at 293–94).

Under the SMCRA-created framework, some federal law provisions, including

---

8. The Secretary has not made an argument that the limitations on the *Ex parte Young* exception described in *Coeur d'Alene,* 521 U.S. at 282–283, 117 S.Ct. 2028; *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 74, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); and *Edelman v. Jordan,* 415 U.S. 651, 664–667, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), are applicable.

those at issue in *Bragg,* "drop out" after the state law plan has been approved. *Id.* at 289, 295. Conversely, when a state fails to submit a program for approval, the federal program is applicable and the Secretary of the Interior is vested with "exclusive jurisdiction" to regulate surface coal mining in the non-primacy state. *Id.* at 289 (citing 30 U.S.C. § 1254(a)). The mutual exclusivity of state and federal law in the SMCRA context was paramount in *Bragg,* 248 F.3d at 289, 293–295.

Although "[t]he federal requirements 'drop out' as operative provisions" upon approval of a state mining reclamation program, "they 'continu[e] to provide the 'blueprint' against which to evaluate the State's program' and can be reengaged in a 30 U.S.C.A. § 1271 enforcement proceeding by the Secretary [of the Interior]." *Kempthorne,* 473 F.3d at 97 (quoting *Bragg,* 248 F.3d at 289). SMCRA "manifest[s] an ongoing federal interest in assuring that minimum national standards for surface coal mining are enforced ... through a limited and ordered federal oversight, grounded in a process [as set forth in 30 U.S.C. § 1254(a), 1267, 1271] that can lead ultimately to the withdrawal of the State's exclusive control" if a state fails to abide by its plan. *Bragg,* 248 F.3d at 294 (citing 30 U.S.C. §§ 1271, 1267; *In re Permanent Surface Mining Regulation Litig.,* 653 F.2d 514, 520 (D.C.Cir.1981) (en banc)). Though not discussed in *Bragg,* SMCRA continues to preempt state laws and regulations that are inconsistent with federal standards, *see* 30 U.S.C. § 1255, and the OSM retains the right to enter and inspect mines to evaluate the state's administration of its program and may enforce part of a state's regulatory program if it finds the state to be doing an inadequate job. *Id.* §§ 1267(a), 1254(b). Nevertheless, with respect to surface coal mining, a SMCRA primacy state's regulatory power is exclusive in the sense that the federal enforcement provisions drop out upon approval of the state program and largely remain unavailable as long as the State is in compliance with its own program. *See id.* §§ 1252–55, 1267, 1270–71.

As such, "characterizing the regulatory structure of SMCRA as 'cooperative' federalism is not entirely accurate, as the statute does not provide for *shared* regulation of coal mining." *Bragg,* 248 F.3d at 293. Rather, SMCRA "provides for enforcement of either a federal program or a State program, but not both. Thus, in contrast to other 'cooperative federalism' statutes, SMCRA exhibits extraordinary deference to the States." *Id.* The court of appeals explained that its conclusion in *Bragg* was,

> that in that context "any injunction against State officials to enforce this provision would command them to comport with the State's own law, not federal law, because only the State law [was] operative and directly regulate[d] the issuance of [mining] permits." [*Bragg,* 248 F.3d] at 296. Therefore, in that context, the *Ex Parte Young* exception did not apply.

*Antrican,* 290 F.3d at 187. Furthermore, ordering the State to comport with federal law would impermissibly end "exclusive State regulation and undermine the federalism established by [SMCRA]." *Bragg,* 248 F.3d at 295.

### B.

While the Secretary looks to *Bragg* in support of his assertion of immunity, plaintiffs also find support in that opinion. Plaintiffs point out, and the Secretary admits, that there are differences between the CWA and SMCRA. (Mem. in Supp. of M.S.J. at 2; Resp. to M.S.J. at 7). Noting these differences, *Bragg* states:

> The statutory federalism of SMCRA is quite unlike the cooperative regime under the Clean Water Act, 33 U.S.C.

§ 1251 et seq., which was construed in *Arkansas v. Oklahoma,* 503 U.S. 91, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992). As the Supreme Court noted there, one of the Clean Water Act's regulations "effectively incorporated" State law into the unitary federal enforcement scheme, making State law, in certain circumstances, federal law. *Id.* at 110, 112 S.Ct. 1046 (emphasis added). Under SMCRA, in contrast, Congress designed a scheme of mutually exclusive regulation by either the U.S. Secretary of the Interior or the State regulatory authority, depending on whether the State elects to regulate itself or to submit to federal regulation.

*Bragg,* 248 F.3d at 294. This statement alone, however, does not resolve the question of whether the Secretary is immune from suit under the Eleventh Amendment.

As discussed more fully below, the statutory federalism of the CWA is indeed quite different from that of SMCRA. The Court in *Arkansas* discussed only a narrow aspect of the interaction between state and federal law under the CWA. In *Arkansas,* the EPA issued an NPDES permit to the city of Fayetteville, Arkansas for the operation of a sewage treatment plant. The water discharged from the plant made its way to the Illinois river, which flows though Oklahoma. Oklahoma challenged the issuance of the permit, contending that it violated Oklahoma water quality standards. As an initial matter, the Court found that the EPA acted within its discretion under the CWA in enacting a regulation prohibiting the issuance of NPDES permits if the conditions of the permit cannot ensure compliance with the water quality standards of all affected states. *Id.* at 107, 112 S.Ct. 1046. The Court then held that the EPA did not err in issuing a permit to Fayetteville. *Id.* at 113–114, 112 S.Ct. 1046.

When *Arkansas* was decided, the state of Arkansas had not been authorized to issue NPDES permits, and the EPA was therefore the entity responsible for administering the NPDES permit program in Arkansas. Further, and importantly, the Court's discussion of the relationship between state and federal law under the CWA was largely limited to its finding that the EPA regulation requiring NPDES permits to comply with the water quality standards of affected states "effectively incorporates into federal law those state-law standards the Agency reasonably determines to be applicable." *Id.* at 110, 112 S.Ct. 1046. The Court offered the following rationale for this conclusion:

First, as discussed more thoroughly above, we have long recognized that interstate water pollution is controlled by federal law. Recognizing that the system of federally approved state standards as applied in the interstate context constitutes federal law is wholly consistent with this principle. Second, treating state standards in interstate controversies as federal law accords with the Act's purpose of authorizing the EPA to create and manage a uniform system of interstate water pollution regulation.

*Id.* (internal citation omitted).

As noted in *Bragg, Arkansas* indeed stands for the proposition that "in certain circumstances" the CWA incorporates state into federal law. *Bragg,* 248 F.3d at 294. Yet, the circumstances presented by this action are not synonymous with those in *Arkansas.* West Virginia has been authorized to administer its own NPDES permit program, and this case does not involve an interstate dispute. Nor does this dispute involve a question of the propriety of issuing a permit, but instead asks whether obtainment of a permit by the WVDEP is necessary, and whether such

necessity springs from state or federal law. While the distinction in *Bragg* between the CWA and SMCRA is helpful as a starting point, resort must be had to the text of the CWA and other relevant authority to determine whether the requirement that the WVDEP obtain a NPDES permit arises from state or federal law.

### C.

 The court must first determine whether the CWA contemplated the same exclusivity of regulation as SMCRA, as interpreted by *Bragg.* The CWA's delegation of administrative responsibility for the NPDES permitting process to willing states is similar, in some respects, to the delegation of responsibility in SMCRA. Upon federal approval of a state's program for the regulation of surface coal mining, SMCRA's federal regulatory provisions "drop out." *Bragg,* 248 F.3d at 289, 295. The analogous portion of the CWA provides,

> (c) Suspension of Federal program upon submission of State program; withdrawal of approval of State program; return of State program to Administrator
>
> (1) Not later than ninety days after the date on which a State has submitted a program (or revision thereof) pursuant to subsection (b) of this section, the Administrator *shall suspend the issuance of permits* under subsection (a) of this section as to those discharges subject to such program unless he determines that the State permit program does not meet the requirements of subsection (b) of this

section or does not conform to the guidelines issued under section 1314(i)(2) of this title. If the Administrator so determines, he shall notify the State of any revisions or modifications necessary to conform to such requirements or guidelines.

33 U.S.C. § 1342(c)(1) (emphasis added).[9] Federal approval of a state's water pollution permit program results in suspension of the CWA's federal permit program—but *only* the permit program. *See id.* Other provisions of the CWA remain. *See id.; Washington Wilderness Coalition v. Hecla Mining Co.,* 870 F.Supp. 983, 987 (E.D.Wash.1994) ("Section 1342(c), which suspends the federal permit program upon approval of a state program, simply guarantees that the state will be the sole entity issuing NPDES permits.").

In emphasizing "the unity of purpose behind state and federal CWA programs," courts have held "that citizens may enforce effluent limitations regardless of whether the EPA or a state agency issues the NPDES permits." *Hecla Mining,* 870 F.Supp. at 987 (citing *United States v. Hooker Chem. & Plastics,* 749 F.2d 968 (2d Cir.1984); *Lutz v. Chromatex, Inc.,* 725 F.Supp. 258, 261 (M.D.Pa.1989); *McClellan Ecological Seepage Situation ("MESS") v. Weinberger,* 707 F.Supp. 1182, 1190–91 (E.D.Cal.1988)); *accord Williams Pipe Line Co. v. Bayer Corp.,* 964 F.Supp. 1300, 1317 (S.D.Iowa 1997); *Ohio Valley Envtl. Coal., Inc. v. Hobet Mining, LLC,* No. 3:08–0088, 2008 WL 5377799, at *1, 2008 U.S. Dist LEXIS

---

**9.** In contrast to § 1342(c)(1) of the CWA, SMCRA provides:

> Each State in which there are or may be conducted surface coal mining operations on non-Federal lands, and which wishes to assume *exclusive jurisdiction* over the regulation of surface coal mining and reclamation operations, except as provided in sections 1271 and 1273 of this title and

subchapter IV of this chapter, shall submit to the Secretary, by the end of the eighteenth-month period beginning on August 3, 1977, a State program which demonstrates that such State has the capability of carrying out the provisions of this chapter....

30 U.S.C. § 1253(a) (emphasis added).

105559, at *4 (S.D.W.Va. Dec. 18, 2008). Admittedly, the citizen suits in the *Hecla Mining* strand of cases are distinct from this case inasmuch as, unlike those cases, the State is the target of this suit, not merely a passive observer in the process. Despite the different contexts in which they arise, *Hecla Mining* was nonetheless unwavering in its statement that, "[n]othing in the language or structure of the CWA suggests that citizens suits are incompatible with state administration of the NPDES permit program." 870 F.Supp. at 987. *Hecla Mining* went on to express its belief that, "it would be bad policy to remove a key component of private enforcement from the CWA simply because the EPA has approved a state permit program in lieu of the federal bureaucracy." *Id.; see also Piney Run II,* 523 F.3d at 456 ("We have recognized that this citizen suit provision is critical to the enforcement of the CWA, as it allows citizens to abate pollution when the government cannot or will not command compliance.") (internal citation and quotation marks omitted).

The text of the CWA supports the view employed in *Hecla Mining* that CWA "citizens suits may proceed in states administering their own NPDES permit program." *Id.* First, the definition of "effluent limitation" in § 1362(11) includes "any restriction established by a state or the [EPA] Administrator." Second, juxtaposition of the purpose section of the CWA, 33 U.S.C. § 1251(b), with 30 U.S.C. § 1253 of SMCRA, demonstrates the wisdom of the position taken in *Hecla Mining.* The CWA provides, "[i]t is the policy of Congress to recognize, preserve, and protect the *primary* responsibilities and rights of States to prevent, reduce, and eliminate pollution .... [and] that the States ... *implement the permit programs* under sections 1342 and 1344 ...." 33 U.S.C. § 1251(b) (emphasis added). The congressional articulation of policy to vest the States with "primary" authority

under the CWA is distinct, in a profoundly important way, from the "exclusive" authority vested in states under SMCRA. *See* 30 U.S.C. § 1253(a). As a consequence, upon EPA acceptance of a state's plan for administration of the NPDES permit program, neither federal nor state law completely "drop out."

Importantly, the congressional preference for state implementation of permit programs under the CWA framework is narrower in scope than the exclusive regulation of all surface mining matters reserved for primacy states in the SMCRA regime. As pointed out in *Hecla Mining,* § 1342(c) of the CWA, "which suspends the federal permit program upon approval of a state program, simply guarantees that the state will be the sole entity issuing NPDES permits." 870 F.Supp. at 987. The statutory framework of the CWA stands in stark contrast to the relevant SMCRA provisions at issue in *Bragg,* which give states "exclusive regulatory control through enforcement of their own approved laws" because "Congress intended that the federal law establishing minimum national standards would 'drop out' as operative law and that the State laws would become the sole operative law." *Bragg,* 248 F.3d at 295.

The cooperative nature of the CWA model as recognized in *Bragg,* 248 F.3d at 294, and *Arkansas,* which specifically stated that the CWA "anticipates a partnership between the States and the Federal Government," 503 U.S. at 101, 112 S.Ct. 1046, is in accord with the *Hecla Mining* position that federal CWA citizen suits are viable regardless of whether a state has been granted the authority to administer its own NPDES program. The CWA does not seek to attain the conditional exclusivity of regulation found in *Bragg* to exists under SMCRA. Based on the text of the CWA, including its statement of congres-

sional purpose, coupled with the understanding in *Arkansas* and *Bragg* that the CWA generally was intended to be a cooperative scheme between the states and the federal government, and the rationale articulated in *Hecla Mining*, the court finds the CWA's citizen suit provision remains viable in the realm of remedying violations of CWA water quality measures and the NPDES permit requirement.[10]

## D.

Having determined that the CWA did not contemplate the same exclusivity of regulation as SMCRA, which therefore allows the enforcement of a federal cause of action regarding the discharge of pollutants to survive the suspension of the federal permit program, the next question is whether the plaintiffs' claim is brought pursuant to state or federal law. The answer lies in part in the different nature of the claims in *Bragg* and the claim in this case.

The two counts in issue in *Bragg* alleged that the Secretary of the WVDEP engaged in a practice of approving mountaintop removal permits without making the appropriate findings and further that the necessary findings could not be made accurately given the impossible requirements of the state regulation. 248 F.3d at 286–88. The plaintiffs argued that the Secretary had violated his nondiscretionary duty under SMCRA in neglecting to make the requisite findings, and by failing to comply with applicable federal and state regulations. *Id.* at 286–87.

Here, the characterization of the plaintiffs' only claim is vital. Plaintiffs are suing the WVSP for its activities as a polluter, not as the entity issuing permits. Their claim is brought under 33 U.S.C. § 1365 for violation of § 1311(a). As found above, the WVDEP is a "person" under the CWA and therefore pursuant to § 1311(a) is prohibited from discharging pollutants without a permit. Unlike in *Bragg*, § 1311 does not drop out when the federal permitting program is suspended in favor of the state's federally-approved program. As a consequence, it does not matter in this instance whether the issuance of the per-

---

**10.** This is so despite the following passage from a 1977 House Report cited by the Secretary:

> The Conference substitute provides for the administration by a state of its own permit program for the regulation of the discharge of dredged or fill material into the navigable waters other than traditionally navigable waters and adjacent wetlands if the program of the State meets the requirements set forth in the Conference substitute and is approved by the Environmental Protection Agency. *The Federal program for the regulation of the discharge of dredged or fill material into these waters is then suspended.*
>
> *The conferees wish to emphasize that such a State program is one which is established under State law and which functions in lieu of the Federal program. It is not a delegation of Federal authority. This is a point which has been widely misunderstood with regard to the permit program under section 402 of the Act* .... That section, after which

the Conference substitute concerning State programs for the discharge of dredged or fill material is modeled, also provides for State programs which function in lieu of the Federal programs and does not involve a delegation of Federal authority.

(Defs.' Resp. to M.S.J. at 8–9, quoting H.R.Conf. Rep. No. 830, 95th Cong., 1st Sess. 104 (1977), U.S. Code Cong. & Admin. News 1977, pp. 4424, 4479 (emphasis added by defendant)). While the House report's suggestion that the state permit program functions in lieu of the federal permit program is supported by the text of the statute, the suggestion that federal regulation of discharges of pollutants is suspended altogether is not supported by the text of the CWA. *See* 33 U.S.C. 1342(c). Obviously, to the extent the report and the statute are not in sync, the statutory text controls. *See Holder v. Hall*, 512 U.S. 874, 935, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994) (THOMAS, J., concurring).

mit is governed by state law or federal law. The discharge of pollutants without a permit is the act the claim seeks to remedy, and it is governed by federal law. The fact the remedy—the permit—is to be issued by the state is of little moment. The plaintiffs are not suing the Secretary to force the WVDEP to issue a permit; instead, plaintiffs seek to have the WVDEP comply with § 1311(a), a federal law, by obtaining a permit for its activities as a "person" discharging pollutants. While the distinction may be subtle, it is nonetheless real.

The state, as an actor and operator of the bond forfeiture sites, is the polluter in this case; whereas, in *Bragg*, the state's misconduct was in terms of the state's failure to act in its regulatory role. The state in *Bragg* was not the entity directly responsible for the harmful environmental effects and its misdeeds, if any, were governed exclusively by state law.[11]

In sum, the exclusivity of regulation under SMCRA is similar to the CWA only with respect to the CWA's permitting regime. Not all of the CWA provisions drop out or are suspended upon approval of a state permit program under the CWA. The claim that the Secretary is discharging pollutants without a permit retains its federal character notwithstanding state regulation of the permit program. *See* 33 U.S.C. §§ 1311(a), 1342.[12] As such, the *Ex parte Young* exception to the Eleventh Amendment is applicable. The Secretary is in violation of the CWA. *Accord West Virginia Highlands Conservancy, Inc. v. Huffman*, 588 F.Supp.2d at 692.

## VI.

It is accordingly ORDERED that plaintiffs' motion for summary judgment and declaratory and injunctive relief be, and it hereby is, granted. The court DECLARES the Secretary to be in violation of the National Pollutant Discharge Elimination System permitting requirements of the Clean Water Act. It is further ORDERED that the Secretary apply for, and obtain, NPDES permits for all sites at issue in this action.

The parties are directed to appear for a status conference to address the remaining

---

11. Section 1342(c)(3) allows the EPA to withdraw approval of a state's permit program when the state is not following its federally-approved plan. The procedures to be followed are explained as follows:

> Whenever the Administrator [EPA] determines after public hearing that a State is not administering a program approved under this section in accordance with requirements of this section, he shall so notify the State and, if appropriate corrective action is not taken within a reasonable time, not to exceed ninety days, the Administrator shall withdraw approval of such program. The Administrator shall not withdraw approval of any such program unless he shall first have notified the State, and made public, in writing, the reasons for such withdrawal.

33 U.S.C. § 1342(c)(3). The Secretary has not made the argument that the statutory design of the CWA would be frustrated by allowing this suit to go forward. Assuming it had, while the court is sensitive to the delicate balance of cooperative federalism created by the CWA, such an argument would be unavailing. Section 1342(c)(3) provides for the withdrawal of a state's permitting authority when the EPA determines that the state is improperly administering its permit program. The question is here is whether in its capacity as a polluter the WVDEP must obtain a permit; plaintiffs have not alleged that the WVDEP has neglected its duties as the administrator of the West Virginia NPDES permit program. Thus, this case does not implicate the authority of the EPA under § 1342(c)(3).

12. As noted in the parallel action filed in the Northern District of West Virginia, cases addressing the issue "have held that the Eleventh Amendment does not bar citizen suits under the CWA for prospective injunctive relief against state officials for violation of state-issued NPDES permits." *Huffman*, 588 F.Supp.2d at 686 (collecting examples).

issues in this case at 11:00 a.m. on September 4, 2009.

The Clerk is directed to forward copies of this memorandum opinion and order to all counsel of record.